### SAN MARINO SAVINGS AND LOAN ASSOCIATION, Plaintiff,

### v.

### FEDERAL HOME LOAN BANK BOARD; Federal Savings and Loan Insurance Corporation; Lawrence W. Taggart, Commissioner, Savings and Loan Department, State of California; Timothy J. Lane; and Mary Liz Orban, Defendants.

No. CV 84–0776–RJK (JRx).

United States District Court, C.D. California.

Nov. 19, 1984.

Leff & Mason, Ernest Leff, Andrew E. Katz, Stephen G. Polard, Beverly Hills, Cal., for plaintiff.

Tuttle & Taylor Inc., A. James Roberts, III, Merrick J. Bobb, Alan E. Friedman, Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KELLEHER, Senior District Judge.

This action came on for trial before the Court, the Honorable Robert J. Kelleher, Senior District Judge, presiding, and the issues having been duly tried, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

Plaintiff San Marino Savings and Loan Association ("San Marino") is a California-chartered stock savings and loan association incorporated under the laws of the State of California with its principal place of business in San Marino, California.

Defendant Federal Home Loan Bank Board ("Bank Board") is an independent federal agency established by Congress with its headquarters in Washington, D.C.

San Marino's savings deposit accounts are insured by the Federal Savings and Loan Insurance Corporation ("FSLIC").

The Bank Board is the operating head of FSLIC.

San Marino is subject to the regulatory authority of the Bank Board and FSLIC.

On February 3, 1984, the Bank Board adopted Resolution 84–59 appointing FSLIC the sole conservator for San Marino, based upon its findings that: (i) San Marino had incurred substantial dissipation of assets and earnings due to violations of law, rules, and regulations and to unsafe and unsound practices, and (ii) San Marino was in an unsafe and unsound condition to transact business. It also found that San Marino had violated a cease and desist order of the Commissioner, Savings and Loan Department of the State of California, dated December 4, 1983, as amended December 30, 1983.

On February 3, 1984, the Commissioner of the California Savings and Loan Department, Lawrence W. Taggart, gave his written approval and concurrence that the grounds for the appointment of a conservator existed as specified by the Bank Board.

On February 3, 1984, at approximately 5:00 p.m., FSLIC took possession of the assets and property of San Marino as its sole conservator.

There were facts before the Bank Board, when it acted on February 3, 1984, on which the Bank Board could and did reasonably conclude that statutory grounds existed for its appointment of FSLIC as conservator.

### BONA/DOMINGUES LOANS

Prior to January 1984, San Marino made loans to Jack Bona and Frank Domingues, to companies controlled by them ("Bona/Domingues") or to investors solicited by them in the amount of $193,931,-320.00.

Seventeen condominium conversion projects, located primarily in Texas, were used as collateral for the approximately $194 million in loans.

The condominium conversion projects were purchased by Bona/Domingues with San Marino loan proceeds.

In the aggregate Bona/Domingues paid approximately $104 million for the condominium conversion projects.

In substantially all instances the investor-borrowers had invested in cash no more than one percent of the purchase price for the various condominium conversion projects or units contained therein.

As these loans were funded, San Marino received appraisals of approximately $243 million on the Bona/Domingues properties, or almost two and one-half times the aggregate purchase prices of the properties. These appraisals were excessive.

The loans to Bona/Domingues resulted in a substantial dissipation of assets of San Marino due to violations of law, rules and regulations or to unsafe or unsound practices and placed San Marino in an unsafe and unsound condition to transact business.

During a portion of the time these loans were made to Bona/Domingues, five directors of San Marino (Messrs. Forde, Casanova, Crissman, Shelton, and Guiltinan) were indebted to Messrs. Bona and Domingues in the amount of $600,000. The aforementioned directors had borrowed the money from Bona and Domingues to buy stock in San Marino.

In early January 1984, San Marino, and the federal and state regulators, knew that Mr. Domingues threatened to default on $80 million in loans from San Marino.

### THE DOMINGUES BUY BACK

On January 9, 1984, San Marino bought from Mr. Domingues units in nine of the seventeen Bona/Domingues condominium conversion projects in exchange for cancellation of $80 million in indebtedness. This transaction is referred to hereafter as the "Domingues Buy Back."

At the time of the Domingues Buy Back, San Marino knew that the Bank Board was having the Bona/Domingues properties reappraised.

At the time of the Domingues Buy Back, San Marino also knew that the regulators believed those properties were worth substantially less than the loan amounts they secured.

San Marino intended to accomplish the Domingues Buy Back without prior disclosure to the state or federal regulatory agencies and did not present the Buy Back to federal or state regulators for their review. The Domingues Buy Back was negotiated and documented over the weekend of January 7–8. The transaction was consummated on January 9, prior to any disclosure to state or federal regulators, in violation of the state cease and desist order then in effect to which the Board of Directors of San Marino had consented.

San Marino entered into the Domingues Buy Back to obtain control of the property in order to avoid appraisal losses on the loans thereon.

After the Domingues Buy Back, San Marino continued to hold loans in substantial amounts to Bona/Domingues or to investors solicited by them, secured by the remaining condominium conversion projects and units not covered by the Buy Back.

### THE LA JOLLA EXCHANGE TRANSACTIONS

San Marino embarked upon a plan to dispose of the properties acquired from Mr. Domingues in order to avoid the imposition of appraisal reserves by the Bank Board.

In order to achieve this result, it was important to San Marino that it dispose of these properties as quickly as possible.

On January 28, 1984, representatives of San Marino met with Leon Brukman, a principal of La Jolla Exchange, Inc. ("La Jolla Exchange"), to discuss the exchange of certain of the properties acquired in the Domingues Buy Back for a parcel of property located in northern San Diego, known as the Lake La Jolla property.

The agreements that were ultimately reached between San Marino and La Jolla Exchange are reflected in two documents: the Exchange Agreement and the Real Estate Purchase Agreement ("Purchase Agreement").

Under the terms of the Exchange Agreement: (i) San Marino conveyed its interests in six of the projects it had acquired in the Domingues Buy Back to La Jolla Exchange to which the parties assigned a value of $60 million; (ii) La Jolla Exchange conveyed the Lake La Jolla property to San Marino to which the parties assigned a value of approximately $69 million; (iii) San Marino paid approximately $8 million in cash to La Jolla Exchange; and (iv) San Marino loaned $37 million to La Jolla Exchange secured by first trust deeds on the six projects conveyed to La Jolla Exchange.

Under the terms of the Purchase Agreement, San Marino purchased from La Jolla Exchange properties located in Utah ("Utah properties") and in California for $15.8 million. Of this amount, approximately $7–8 million was used to pay off existing liens on the properties and approximately $8 million was paid in cash to La Jolla Exchange.

San Marino financed the La Jolla Exchange transaction primarily by means of soliciting from brokers jumbo certificates of deposit in increments of $100,000 or more. Approximately $40 million in such funds were raised during the week preceding the transaction. These certificates of deposit had maturity dates ranging from 60 days to one year, compared to a five-year maturity date for the $37 million loan to La Jolla Exchange.

The Exchange Agreement and Purchase Agreement were negotiated, documented, and executed between January 28, 1984 and February 1, 1984.

San Marino wire transferred approximately $53.5 million into escrow for the La Jolla Exchange transactions on February 2, 1984.

At the time, San Marino knew that the transactions with La Jolla Exchange would not be approved by the California Commissioner of Savings and Loans or by the Bank Board. It was San Marino's intent to negotiate, document, and close the transactions without prior disclosure to state and federal regulators. San Marino did not provide any disclosure of the transactions with state or federal regulators prior to its closing.

There exists a reasonable basis in fact for the Bank Board's assertion that the La Jolla Exchange transactions were consummated in an unsafe and unsound manner.

San Marino entered into the transactions with La Jolla Exchange without conducting a minimally adequate investigation of the credit worthiness or financial reliability of Leon Brukman or La Jolla Exchange.

In major transactions, San Marino testified that it was its custom and practice to make inquiries regarding the party's prior bankruptcies and pending lawsuits, to obtain credit reports, to seek information from the California Corporations Commissioner, the California Secretary of State, and other persons who had done business with the party, and to review the party's income tax returns.

With respect to the La Jolla Exchange transaction, San Marino had not, prior to February 2, 1984: (i) reviewed any court files, either state or federal, to determine if there were any lawsuits pending against Mr. Brukman or any of his companies; (ii) commissioned a credit report on Mr. Brukman or any of his companies; (iii) obtained an audited financial statement; (Instead, San Marino relied upon an unaudited compilation of La Jolla Exchange dated six months earlier and made no effort to discuss this compilation with the accountant who prepared the statement); (iv) reviewed any of the tax returns of La Jolla Exchange; (v) made any effort to check the Bankruptcy Court's files to determine what the status of Mr. Brukman's bankruptcy proceedings were or the bankruptcies of any of his companies even though it knew that Mr. Brukman and one of his companies were involved in a bankruptcy proceeding; (vi) reviewed any of the files of the California Commissioner of Corporations with respect to La Jolla Exchange; and (vii) reviewed any filings with the Secretary of State of the State of California with respect to La Jolla Exchange.

San Marino entered into the La Jolla Exchange transactions without conducting an adequate investigation into the value of the Lake La Jolla property. Prior to February 2, 1984, San Marino had not obtained an appraisal for the Lake La Jolla property.

San Marino entered into the La Jolla Exchange transactions without conducting an adequate investigation into the Utah properties. Prior to February 2, 1984, San Marino representatives had never visited the Utah properties and had never commissioned any appraisals on those properties.

To the extent that the value of the Lake La Jolla property was less than $69 million, San Marino intended in the Exchange Agreement to rely upon the guarantee of La Jolla Exchange.

San Marino lacked an adequate basis for reliance on this guarantee.

There exists a reasonable basis in fact for the Bank Board's assertion that the La Jolla Exchange transaction involved violations of law and regulations.

San Marino's failure to review the La Jolla Exchange transactions with federal or state regulators prior to their closings constituted a violation of the state cease and desist order to which the Board of Directors of San Marino had consented.

The loan of $37 million by San Marino to La Jolla Exchange violated state and federal loans-to-one-borrower limitations.

There exists a reasonable basis in fact for the Bank Board's assertion that the Lake La Jolla property had a value substantially less than $69 million.

The administrative record reflects, and plaintiff does not contest: (i) that the La Jolla property had been acquired on February 2, 1984 by Central Savings and Loan Association for $36 million; and (ii) that the La Jolla property had been purchased on February 2, 1984 by La Jolla Exchange from Central Savings and Loan Association for $43.5 million.

The testimony of Mr. Holmes, commissioned as an appraiser for La Jolla Exchange, as to the value of the Lake La Jolla property is lacking in credibility and is not accepted.

If the $60 million book value of the Domingues Buy Back properties that were exchanged with La Jolla Exchange in fact reflected their true value, the Exchange transaction resulted in a substantial dissipation of assets.

If, as the Bank Board reasonably believed, the value of the Bona/Domingues properties swapped with La Jolla Exchange was approximately $37 million, then the La Jolla Exchange transactions did not ameliorate the prior substantial dissipation of assets incurred in the original Bona/Domingues loans.

San Marino, and in particular its Chairman, Mr. Forde, and its Chief Operating Officer and Chief Financial Officer, Mr. Casanova, engaged in a course of conduct which caused inappropriate and unacceptable levels of risk to deposits insured by FSLIC.

Any conclusion of law which should be deemed a finding of fact is hereby adopted as such.

## CONCLUSIONS OF LAW

This action arises under federal law pursuant to the provisions of 12 U.S.C. § 1464(d)(6)(A) (1984) and 12 U.S.C. § 1729(c)(1)(B) (1984).

Jurisdiction exists under 28 U.S.C. §§ 1331, 1337 (1984).

Venue is properly laid in the Central District of California pursuant to 12 U.S.C. § 1464(d)(6)(A) (1984).

The Federal Home Loan Bank Board ("Bank Board") is an independent federal agency established by Congress. 12 U.S.C. § 1437 (1984).

The Bank Board is charged with the administration of the Home Owners' Loan Act of 1933, 12 U.S.C. §§ 1461 *et seq.* (1984), and with administration of subtitle IV of the National Housing Act, 12 U.S.C. §§ 1724 *et seq.* (1984).

The Bank Board is the operating head of the Federal Savings and Loan Insurance

Corporation ("FSLIC"), which insures and regulates eligible state and federal thrift institutions pursuant to 12 U.S.C. §§ 1725(a), 1726 (1984).

Congress has vested the Bank Board with authority to supervise all thrift institutions, including savings and loan associations, that are chartered by the Bank Board or are insured by FSLIC. 12 U.S.C. §§ 1464(a)(1), 1725(c) (1984).

San Marino Savings and Loan Association ("San Marino") is a California-chartered stock savings and loan association whose savings deposit accounts are insured by FSLIC pursuant to 12 U.S.C. § 1726 (1984) and accordingly is subject to the regulatory authority of FSLIC and the Bank Board.

Congress has given to the Bank Board the discretion and exclusive authority to appoint FSLIC as sole conservator of a FSLIC-insured, state-chartered institution without notice. 12 U.S.C. § 1729(c)(1)(B) (1984).

Such authority may be immediately exercised by the Bank Board in the event that the Bank Board determines that any of the grounds specified in 12 U.S.C. § 1464(d)(6)(A) (1984) exist with respect to a FSLIC-insured, state-chartered institution. Such authority may be exercised immediately if the state official having jurisdiction over the institution gives his written approval of and concurrence in the Bank Board's determination. 12 U.S.C. § 1729(c)(1)(B) (1984).

The grounds set forth in 12 U.S.C. § 1464(d)(6)(A) are: (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members; or (ii) substantial dissipation of assets or earnings due to any violation or violations of law, rules or regulations, or to any unsafe or unsound practice or practices; or (iii) an unsafe and unsound condition to transact business.

On February 3, 1984, the Bank Board adopted Resolution 84–59 appointing FSLIC as sole conservator for San Marino based upon the Bank Boards findings that the grounds set forth at 12 U.S.C. §§ 1464(d)(6)(A)(ii) and (iii) existed. The Bank Board found further that San Marino violated a cease and desist order of Lawrence W. Taggart, the Commissioner of the California Savings and Loan Department.

The determination of the Bank Board was taken with the specific written consent of Mr. Taggart pursuant to 12 U.S.C. § 1729(c)(1)(B) (1984).

Pursuant to 12 U.S.C. § 1464(d)(6)(A) (1984), in the event of appointment of a conservator, an action may be brought, within 30 days thereafter, in the United States District Court for the judicial district in which the home of the association is located, or in the United States District Court for the District of Columbia, for an order requiring the Bank Board to remove such conservator, and the court shall upon the merits dismiss such action or direct the Bank Board to remove the conservator. Such proceedings shall be given precedence over other cases pending in such courts, and shall be in every way expedited.

Pursuant to § 1464(d)(6)(A) (1984), this action was timely commenced on February 6, 1984. On February 7, 1984, this Court, per Chief Judge Manuel Real, denied plaintiff's application for temporary injunctive relief and set the matter down for trial commencing February 15, 1984 before this Court. Shortly thereafter, plaintiff dismissed all defendants except for the Bank Board.

On February 15, 1984, the Court and the parties agreed that as an initial step toward an expedited and orderly resolution of the matter, the Bank Board would introduce the administrative record before the Bank Board when it acted on February 3, 1984. It was further agreed the Bank Board would isolate from the record certain exhibits and transactions that the Bank Board contended, standing alone, and without waiving such other transactions and events as may be reflected in the record, constituted a sufficient basis for appointment of a conservator.

On February 16, 1984, the Bank Board proffered Exhibit 900, constituting the

transcript of the proceedings before the Bank Board, Exhibit 901, constituting the resolutions adopted by the Bank Board, Exhibit 902, constituting the written consent of the Commissioner Taggart, and Exhibit 904, constituting the administrative record. The Bank Board also introduced Exhibit 903, which constituted documents extracted from the administrative record. Exhibits 903 and 904 were introduced and received in evidence for the limited purpose of showing that which was before the Bank Board on February 3. Exhibits 900, 901 and 902 were admitted into evidence for what they purported to be, i.e., the transcript, the resolutions of the Bank Board, and Mr. Taggart's letter of consent. Also on February 16, plaintiff proffered Exhibit 1000, constituting further excerpts from Exhibit 904 which San Marino contended was necessary to counter purported facts presented in Exhibit 903. Exhibit 1000 was introduced into evidence for the limited purpose of showing that which was before the Bank Board on February 3.

Also on February 16, the Court and parties understood and agreed that the Court would decide as an initial matter whether the administrative record before the Bank Board, if true, constituted a sufficient basis for the appointment of a conservator. If so, plaintiff would be afforded an opportunity to contest the factual accuracy of the record.

On March 1, 1984, the Court entered its minute order concluding that the evidence in the record, if true, supported the appointment of a conservator and set the matter down for further trial on March 6, 1984.

On March 6, 1984, the Court and parties agreed that the next phase of the trial would focus principally on the La Jolla Exchange transactions which plaintiff contended were ameliorative transactions that cured any alleged substantial dissipation of assets related to the collateral for the Bona/Domingues loans involved in the Domingues Buy Back. Plaintiff offered to demonstrate that the Bank Board abused its discretion by concluding from the infor-

mation before the Bank Board that the La Jolla Exchange transactions were not ameliorative. The Bank Board agreed to this focused inquiry without waiving its reliance upon the entire administrative record and without waiving its right to rebut plaintiff's case, if necessary.

Commencing March 8, 1984, and continuing on March 14, 15 and 16, plaintiff presented its case.

■ The ultimate issue before this Court is whether San Marino has "sustained the burden of proving that the [Bank] Board abused its discretion in reaching its 'opinion' that a [conservator] should be appointed." *Washington Federal Savings and Loan Association v. Federal Home Loan Bank Board*, 526 F.Supp. 343, 349 (N.D. Ohio 1981). In other words, the Court must determine "whether there were facts before the [Bank] Board, when it acted, on which the [Bank] Board could reasonably have concluded that 'a' statutory ground existed for appointment of a [conservator]." *Biscayne Federal Savings and Loan v. Federal Home Loan Bank Board*, 720 F.2d 1499, 1505 (11th Cir.1983); *see also, Fidelity Savings and Loan Association v. Federal Home Loan Bank Board*, 689 F.2d 803, 814 (9th Cir.1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1983, 77 L.Ed.2d 283 (1983).

■ The appropriate standard of review is the arbitrary and capricious test. "The 'arbitrary and capricious' standard of review is a narrow one. [Citation] Its scope is more restrictive than the 'substantial evidence' test which is applied in reviewing formal findings made on a hearing record. [Citation] 'Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis.' [Citation] Something more than mere error is necessary to meet the test. [Citation] To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was 'wilful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case.'" *First National Bank of Fayetteville v.*

*Smith,* 508 F.2d 1371, 1376 (8th Cir.1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975) (citations omitted).

Section 1464(d)(6)(A) does not permit the Court, in its review of the Bank Board's action, to determine if lesser remedies would have been appropriate. *Fidelity, supra,* 689 F.2d at 809; *Biscayne, supra,* 720 F.2d at 1504.

■ The Bank Board's determinations that a particular condition or practice is unsafe or unsound are entitled to great weight. *Beacon Federal Savings v. Federal Home Loan Bank Board,* 162 F.Supp. 350, 355 (E.D.Wisc.1958). The Court grants deference to the Bank Board with respect to conflicting evidence of the Association's financial condition. *Telegraph Savings and Loan Association v. Federal Savings and Loan Insurance Corporation,* 564 F.Supp. 862, 893 (N.D.Ill.1981), *aff'd sub. nom. Telegraph v. Schilling,* 703 F.2d 1019 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 396, 78 L.Ed.2d 681 (1983).

■ There exists a reasonable basis in fact for the assertions by the Bank Board that there were loan underwriting deficiencies in connection with the Bona/Domingues loans and the La Jolla Exchange transactions. Loan underwriting rules are intended to assure that credit is extended on a sound and prudent basis.

There exists a reasonable basis in fact for assertions by the Bank Board that the loans to Bona/Domingues resulted in a substantial dissipation of assets and placed San Marino in an unsafe and unsound condition to transact business.

There exists a reasonable basis in fact for assertions by the Bank Board that the La Jolla Exchange transactions and the Bona/Domingues loans were undertaken in an unsafe or unsound manner and placed San Marino in an unsafe and unsound condition to transact business.

There exists a reasonable basis in fact for assertions by the Bank Board that the La Jolla Exchange transactions did not cure or ameliorate San Marino's financial condition and actually constituted a substantial dissipation of assets.

There exists a reasonable basis in fact for the Bank Board's assertions that San Marino violated federal and state loans to one borrower regulations in connection with the Bona/Domingues loans and the La Jolla Exchange transactions.

There exists a reasonable basis in fact for the Bank Board's assertions that the Lake La Jolla property had a value substantially less than $69 million.

There exists a reasonable basis in fact for the Bank Board's assertion that San Marino acted precipitously and imprudently in the manner in which it accomplished the La Jolla Exchange transactions.

There exists a reasonable basis in fact for the Bank Board's assertions that the Domingues Buy Back and the La Jolla Exchange transactions violated the state cease and desist order to which the Board of Directors of San Marino had consented.

Such failures of investigation by the Bank Board or erroneous fact in the record as may have existed or have been demonstrated herein are insufficient to establish that the Bank Board's action was arbitrary or capricious or an abuse of discretion.

San Marino, and in particular Messrs. Forde and Casanova, had engaged in a course of conduct that was in violation of regulations, both state and federal, and that by doing so caused unacceptable and inappropriate levels of risk to deposits insured by FSLIC.

The Bank Board did not act arbitrarily or capriciously or abuse its discretion in finding that statutory grounds existed for the appointment of a conservator.

There exists a reasonable basis in fact for the Bank Board's findings that San Marino had substantially dissipated assets or earnings due to violations of law, rules, regulations, or to unsafe or unsound practices or was in an unsafe and unsound condition to transact business within the meaning of 12 U.S.C. § 1464(d)(6)(A)(ii), (iii) (1984).

The Court does find that San Marino had substantially dissipated assets due to violations of laws, rules, regulations or to unsafe or unsound practices and was in an unsafe and unsound condition within the meaning of Section 1464(d)(6)(A)(ii) and (iii).

Any finding of fact which should be deemed a conclusion of law is hereby adopted as such.