**John B. HARALSON, et al., Plaintiffs,**

v.

**The FEDERAL HOME LOAN BANK BOARD, et al., Defendants.**

**Civ. A. Nos. 86–1218, 86–1270.**

United States District Court, District of Columbia.

March 30, 1989.

---

MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

This case involves the appointment by the Federal Home Loan Bank Board ("the Bank Board") of the Federal Savings and Loan Insurance Corporation ("FSLIC") as conservator for Mercury Savings Association of Texas ("Mercury") and Ben Milam Savings & Loan Association ("Milam").

Mercury and Milam are Texas-chartered stock savings and loan associations located in Wichita Falls and Cameron, Texas, respectively, with corporate headquarters in Houston. The deposits of Mercury and Milam are insured by FSLIC pursuant to Section 403 of the National Housing Act, ("NHA"), as amended, 12 U.S.C. § 1726 (1982). Mercury and Milam are subject to the regulatory and supervisory authority of the FSLIC and the Bank Board. *See* 12 U.S.C. §§ 1461 *et seq.*

On March 14, 1986, the Bank Board determined that Mercury and Milam (the Associations) were insolvent, had suffered a substantial dissipation of assets as a result of violations of banking regulations and unsafe and unsound practices by management, and were in an unsafe and unsound condition to transact business within the meaning of Section 5(d)(6)(A)(i)–(iii) of the Home Owner's Loan Act of 1933, as amended, 12 U.S.C. § 1464(d)(6)(A) (1982) (the "HOLA"). Pursuant to Section 406(c)(1)(B) of the NHA, 12 U.S.C. § 1729(c)(1)(B), the Bank Board, with the written approval of the Commissioner of the Texas Savings and Loan Department,

appointed FSLIC the sole conservator of the Associations.

Plaintiffs filed suit on March 16, 1986, seeking removal of the conservator and interim injunctive relief pursuant to 12 U.S.C. § 1464(d)(6)(A), which permits an institution which has been placed in conservatorship or receivership by the Bank Board to bring an action within thirty days for an order removing the conservator or receiver. *Id.*

Their motion for a temporary restraining order was denied. After a hearing on their motion for a preliminary injunction but prior to the ruling thereon, plaintiffs voluntarily dismissed the action and thereafter filed actions in the U.S. District Court for the Western District of Texas, Waco Division, *Haralson v. FHLBB*, Civil No. W–86–CA–53 (W.D.Tex.1986), and the U.S. District Court for the Northern District of Texas, Wichita Falls Division, *Haralson v. FHLBB*, Civil No. CA–7–86–34 (N.D.Tex. 1986). Claims in both of the Texas cases alleging breach of contract against the Commissioner of the Texas Savings and Loan Department were dismissed. Shortly thereafter, the cases were transferred to this court, pursuant to 28 U.S.C. § 1404(a), and were later consolidated.

Defendants were granted summary judgment on all counts of the complaints except one. The sole issue remaining was whether the statutory grounds that permit the Bank Board to appoint FSLIC as conservator for Mercury and Milam were met.

This issue proceeded to trial and after a full hearing, the Court received and evaluated the testimony of the witnesses, reviewed the exhibits admitted in evidence, and heard the argument of counsel. After careful consideration of all the evidence of record, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. In January 1983, plaintiff J.B. Haralson acquired 100 percent of the stock of Mercury and 90 percent of the stock of Milam. Haralson served as the chief executive officer, chairman of the board, and a director of both Associations. The Associations have identical directors and share many other senior management officials.

2. When acquired, the Associations reported combined assets of approximately $122 million. During 1983, the assets of the Associations increased by almost 500 percent to $686 million. This rapid growth continued throughout 1984 and 1985 so that by December 1985 the combined assets of the Associations were over $1 billion.

3. This growth was funded by large dollar certificates of deposit. The funds were invested in many different assets by the Associations, including significant investment in loans to developers to acquire, develop, and construct various real estate projects, particularly in 1984. A.R., Vol. IV Tab 23B at 01427.

4. A Cease and Desist Order was issued by the Texas Savings and Loan Department on September 19, 1984, enjoining both Mercury and Milam from violating both state and federal statutes and regulations and from engaging in unsafe and unsound practices. A.R., Vol. I Tab 4A.

5. On September 25, 1984, the Associations, J.B. Haralson, and the other directors of Mercury and Milam entered into Supervisory Agreements with the Texas Commissioner. A.R., Vol. I Tabs 4B and 4C. The Supervisory Agreements required, among other things, that Haralson divest himself of all ownership in the Associations, and that the Associations terminate all relationships with George J. Aubin, whom the Texas Commissioner found to be a "controlling person" of each Association within the meaning of § 561.28 of the Federal Regulations.

6. Haralson retained E.F. Hutton and Company, Inc., to assist in finding a buyer for the stock of the Associations.

7. E.F. Hutton retained Peat Marwick, Mitchell and Co. to perform a review of the Associations and their subsidiaries in connection with E.F. Hutton's evaluation of the common stock of the Associations.

8. In June 1985, an examination of the Associations was commenced by the Division of Examination of the Federal Home

Loan Bank of Dallas (Dallas Bank). This examination continued through March 14, 1986, the date the conservator was appointed.

9. Three interim reports of the Examiner–In–Charge revealed that the financial condition of the Associations was declining and that the lending practices and procedures which prompted concern were continuing. A.R., Vol. II Tabs 7A, 7B, and 7C.

10. Robert Torres, the Bank Board Examiner–in–Charge of the Associations, was the Bank Board District Appraiser and the designee of the principal Texas Supervisory Agent. He determined that the Associations carried assets on their books that had certain inherent weaknesses. Due to these weaknesses, it was determined that collection in full was unlikely.

11. Application of the Classification of Assets Regulations, 12 C.F.R. 561.16c, 571.-1a and 563.17–2(6), by the Bank Board required that the Associations establish specific loss reserves against certain loans.

12. Five assets were classified by the Bank Board as "Loss" under the Classification of Assets regulations. These assets were known as the Falcon's Lair, L'Atriums, Oates Crossing, Valley Ridge, and Westchase loans. Fifteen assets were classified as "Doubtful". A.R., Vol. III Tab 13A–13T.

13. The District Appraiser received appraisals on March 14, 1986, from independent appraisers of the five "loss" properties.

14. The five loans for which appraisals were received were written down to the extent that the book value recorded by the Associations exceeded the appraisal value obtained by the Bank Board. As a result, Mercury was required to reduce its net worth by $13,482,730 and Milam was required to reduce its net worth by $11,766,-122.

15. The fifteen "doubtful" loans were written down by fifty percent of their reported book value. As a result, Mercury and Milam were required to reduce their respective net worth by $19,143,618 and $19,202,920.

16. Among other things, this write-down was based on the fact that it was determined by the District Appraiser and his staff that the Associations relied on appraisals of the value of the underlying property securing the loans that failed to conform with Bank Board appraisal guideline R–41b or contained demonstrably incorrect assumptions. A.R. Vol. II Tabs 7A–7C.

17. The reclassification of assets of Mercury resulted in a total reduction of its net worth by $32,626,348.

18. The reclassification of assets of Milam resulted in a total reduction of its net worth by $30,969,042.

19. As of January 31, 1986, Mercury had on its books an investment of over $5 million in Gulf Coast Savings, a savings and loan association of which Mercury had purchased all the outstanding stock. It was determined by the Bank Board that Gulf Coast had been losing money continuously since its acquisition by Mercury in June 1984 and in fact had reported to the Bank Board that its net worth as of January 31, 1986, was negative $18 million, A.R., Vol. 4 Tab 16.

20. The Examiner–in–Charge of Mercury determined that Mercury incurred an equity loss of $2,264,206 which it failed to report as required by 12 C.F.R. § 563c.12. *Id.*

21. The insolvency of Gulf Coast required Mercury to establish a specific reserve in the amount of Mercury's remaining investment in Gulf Coast.

22. Mercury's investment in Gulf Coast was overvalued on its books by a total of $5,082,366 and the book value of the asset therefore had to be adjusted to $0. *Id.*

23. Plaintiffs' accounting expert, John Seymour of Greenstein, Logan & Co. ("Greenstein"), the auditors for the Associations, testified that he agreed with the initial adjustment of $2,264,206 with respect to Gulf Coast but disputed the appropriateness of the remaining write-down. The Court chooses not to accept his opinion.

24. Since a difference in appraised valuation, without more, is not enough to overcome the presumption of correctness that attaches to the determination of the Bank Board, *Collie v. Federal Home Loan Bank Board*, 642 F.Supp. 1147, 1154 (N.D.Ill. 1986), the Court finds that the figure reached by the Bank Board is correct. Moreover, further support for this determination is the explicit admission by Gulf Coast that it was insolvent.

25. The total required reductions in net worth resulted in a net worth of negative $28,173,527 for Mercury and of negative $27,403,832 for Milam.

26. A study of the Mercury and Milam loan portfolios were prepared for the Federal Home Loan Bank of Dallas by the accounting firm Grant Thornton & Co. ("Grant Thornton") beginning in November 1985.

27. J. Randolph German, a certified public accountant, was the partner in charge of the Grant Thornton study. He testified that the work within the study had been done in accordance with Generally Accepted Accounting Principles ("GAAP") and the Court accepts his testimony as credible.

28. Thirty-eight (38) transactions were studied by German and his staff.

29. Torres, the Examiner–in–Charge, studied twenty of the thirty-eight transactions. He agreed with Grant Thornton's conclusions regarding nineteen of the twenty commonly-examined transactions.

30. Thirty-two of these same transactions were also examined by Peat Marwick. Peat Marwick agreed with Grant Thornton's conclusions with respect to thirty of the thirty-two transactions. Further, the accounting adjustment recommended by Peat of $29.1 million was very close to the $30.8 million recommended by Grant Thornton.

31. Peat Marwick found that the net worth of Mercury was overstated by $16.6 million. Grant Thornton found that the net worth of Mercury was overstated by $16.3 million.

32. Peat Marwick found that the net worth of Milam was overstated by $14.5 million. Grant Thornton found that the net worth of Milam was overstated by $12.5 million.

33. The Grant Thornton report was prepared independently of any previous Grant Thornton reports.

34. Seymour and William Hargraves of Laventhol & Horwath, an accounting firm retained by Greenstein to support its opinion, testified that the Grant Thornton report was not done in accordance with GAAP because it improperly considered facts subsequent to the date of the transactions, considered improper criteria in classifying the transactions and, in certain instances, applied proper criteria retroactively.

35. In light of contrary testimony of German and the independent confirmation of the correctness of the Grant Thornton conclusions contained in the record, and considering the demeanor of the witnesses, the manner in which they responded to questions, and their overall experience, the Court chooses not to credit the testimony of Seymour or Hargraves.

36. An expert witness offered by plaintiff, Arnold Tesh, criticized the appraisals relied on by the Bank Board when it established estimated reserves for the five loans classified as "Loss" and four of the reviews of appraisals relied on by the Bank Board with regard to loans classified as "Doubtful".

37. No competing factual analysis of value for these loans was offered by plaintiff.

38. Mr. Tesh, although clearly experienced, was so partial to the position of plaintiffs that his expert opinion was tainted. His demeanor, his manner of answering questions, his attempts to control the presentation of evidence by plaintiffs and his manner of answering questions in cross examination lead to this finding. The Court chooses not to be bound by any of his opinions or irrelevant criticisms.

39. The Court finds that the estimates of value submitted by the Bank Board

stand uncontroverted and are accepted by the Court as accurate.

40. The classification of eleven of the fifteen loans classified by the Bank Board as "Doubtful" were not challenged by plaintiff and stand uncontroverted. Those eleven loans, without more, required Mercury to reduce its net worth by $15,584,255 resulting in a net worth as of January 31, 1986, of $7,562,598 and Milam to reduce its net worth by $15,632,934 resulting in net worth of negative $283,724.

41. Although Seymour testified that negative net worth and insolvency are not the same thing, his opinion is not credited and the Court finds that negative net worth falls within the definition of insolvency set forth in 12 U.S.C. § 1464(d)(6)(A).

42. Haralson testified that in his opinion the Associations were extremely liquid and had additional assets which they could have sold to maintain their net worth but failed to specify what assets could have been sold or for what amount of gain.

43. The Court is unable to find from such testimony that continued sale of unidentified assets at an unspecified profit would have been sufficient to remedy the operating losses the Associations were incurring as well as fund the required loan reserves and other required adjustments to net worth.

44. The Court finds that there has been no showing by the plaintiffs that the factual basis for the Bank Board's conclusion that the Associations were insolvent is erroneous.

45. The Interim Examination Reports accurately reflected the quality of the loan portfolios of the Associations, the lack of appropriate documentation in the loan files, and questionable lending practices.

46. Plaintiffs' evidence did not dispute these findings.

47. Pursuant to a recommendation of the Office of Enforcement of the Bank Board on January 27, 1986, see A.R., Vol. I Tab 5A, the Bank Board issued a Notice of Charges and Hearing and a Temporary Order to Cease and Desist against the Associations. A.R., Vol. I Tab 5C.

48. The Associations met and negotiated with the Office of Enforcement a proposed Interim Undertaking. The Interim Undertaking prohibited the Associations from taking specified actions pending the conclusion of an administrative hearing which was to determine whether a permanent cease and desist order should be issued. In lieu of the Cease and Desist Order, the Interim Undertaking and Stipulation Regarding Interim Undertaking were agreed to on February 7, 1986, by FSLIC and the Associations.

49. After achieving a reported net worth of nearly $16 million in December 1983, Mercury's reported net worth decreased to $12.8 million at the end of 1984 and further decreased to $9.8 million as of November 30, 1985.

50. Ben Milam's reported net worth was approximately $15 million in mid–1984 but declined to $9 million by November 30, 1985.

51. According to the calculations of the examiners at the Federal Home Loan Bank of Dallas, Mercury and Milam were approximately $28.2 million and $7.8 million, respectively, below their net worth requirements as of September 30, 1985.

52. The Associations calculated their respective net worth deficiencies at that time as $15.4 million for Mercury and $3.2 million for Milam. The discrepancies result from the difference in treatment of scheduled items and of the liability growth and direct investment components of net worth. A.R., Vol. I Tab 5a at Bates 00195–98.

53. The Bank Board, having determined that the net worth figures reported by the Associations were inaccurate, held a meeting on March 14, 1986, at which the evidence of each institution's net worth was presented by the Bank Board staff to then Chairman Grey and the other Board members.

54. As a result of the meeting, the Bank Board required the Associations to reduce their net worth figures by certain amounts. Specifically, the Bank Board determined that the Associations improperly classified certain acquisition, construction,

and development transactions as loans. These transactions, it was determined by the Bank Board, were more properly classified as investments by the Associations.

55. In addition, the Associations had booked millions of dollars of interest and fee income from these loans. The Bank Board required that the realization of income by the Associations be reversed.

56. The result of these adjustments to the balance sheets of the Associations was that the balance sheets then stated a negative net worth. Members of the Bank Board, on the basis of the evidence presented, ordered a conservatorship.

57. The Court finds that the conclusion reached by the Bank Board that the Associations were in an unsafe and unsound condition on March 14, 1986, is fully supported by the record. The evidence presented in this case also compels a finding that a substantial dissipation of assets had occurred due to regulatory violations as of March 14, 1986.

58. In addition to the negative net worth position of the Associations at that time, the Associations suffered recurring operating losses. A.R., Vol. II at 617–18.

59. The insolvency of the Associations together with the operating losses resulted in a weakened financial condition of the Associations.

60. The Court finds from the evidence that insider transactions had taken place, troubled loans were modified and extended, substantial fees were paid to Hague and Aubin, and Aubin exerted pervasive influence on the affairs of the Associations.

61. David Gallaway, deceased, whose testimony had been preserved by deposition, stated that assets such as a wholly owned subsidiary of the Associations, Wichita Land & Cattle Company, acquired ranches, cattle and race horses, at the urging of Mr. Aubin. The Associations had no knowledge or expertise in such businesses.

62. The transfer of Wichita Land & Cattle Company to Aubin is a suspect transaction, and such transaction violated regulations that prohibit transactions with insiders.

63. Aubin was allowed to substitute 171 residential lots of unknown value and for which there were no appraisals in the loan file for $4 million of collateral securing the Wichita Land & Cattle Company indebtedness. The loan balance was reduced by $120,000. This release of collateral violated the Texas Savings and Loan Commissioner Supervisory Directive and 12 C.F.R. § 563.17–1(c). A.R., Vol. II Tab 8F at 574.

64. The Associations purchased an unprofitable California winery. The evidence is not clear whether the winery was considered an asset of the Associations or a personal asset of Haralson. A.R., Vol. II Tab 7C at 540–543.

65. Fees were paid by the Associations to Hague and Aubin totalling over $6.5 million during the time Haralson controlled the Associations. A.R., Vol. II at 549.

66. Haralson testified that the fees were for loan underwriting services provided to the Associations by Hague and Aubin. The evidence is undisputed that many of the most severe loan problems in the portfolios of the Associations occurred with respect to loans underwritten by Hague and Aubin. The Associations paid fees of $1,474,450 to Hague in connection with transactions that collectively resulted in specific loss reserves of $24,742,149. A.R., Vol. II at 549, 487–88, 491, 496, 499, 504, 513.

67. The evidence reveals that a loan was made by the Associations for $5,000,-000 in connection with what has been referred to as the 1100 Account. This loan was granted in an unsafe and unsound manner. Among other things, the Associations did not receive an adequate return in view of the risk of the loan and the loan was granted without any financial analysis of the stock pledged as security. A.R., Vol. II Tab 7C at 544–46.

68. The 1100 Account was a margin account used by Aubin and the Associations to invest in the stock market. All gain was to the benefit of Aubin and all loss was at the risk of the Associations.

69. Individual funds were commingled with Association funds. Many of the in-

vestments of the Associations were in highly speculative and volatile securities.

70. In connection with this account, the Associations sold assets totalling $39.4 million in violation of the Dallas Bank supervisory directive which required approval prior to the sale of assets having a value in excess of $250,000. A.R., Vol. II at 330–31.

71. The Court finds that Aubin, who was described by Haralson as a consultant, had pervasive influence over Haralson and the Associations.

72. Haralson testified that four or five of the members of the board of directors worked with Aubin for many years.

73. Richard Moore, one such director, testified that he signed any documents put in front of him by Haralson. The board members did not question the actions of Haralson or Aubin, who attended most board meetings before the Texas Commissioner forbade his attendance. The Court finds that the Board of Directors of the Associations failed to exercise judgment and were, in essence, directors in name only. The annual bonuses paid to Haralson is one dramatic example.

74. Gallaway, the former president of the Associations, testified that the influence of Aubin was pervasive. All major business decisions were cleared with Aubin who had authority to hire and fire personnel and to approve investments for the Associations.

75. Aubin held an indirect pledge of the stock of Mercury which he obtained in connection with what is referred to as the 6400 Southwest Freeway transaction. Aubin was given indemnification by the Associations. That indemnification was broader than that afforded officers and directors of the Associations. He was also given indemnification for specific transactions which he negotiated on behalf of the Associations.

76. A corporation wholly owned and controlled by Haralson executed a $60 million promissory note to E.F. Hutton. The note was secured by the pledge of all the stock of Mercury. Aubin made this pledge possible by releasing the indirect pledge he had acquired in the 6400 Southwest Freeway transaction. The note was executed in connection with dealings Aubin had with E.F. Hutton and $48 million of margin indebtedness of Aubin.

77. No evidence having been presented by plaintiffs to dispute these transactions, the Court accepts the evidence as credible.

78. The determination of the Bank Board that the assets of Mercury and Milam were less than their obligations to creditors and others is supported by the evidence adduced during trial. It is found as a fact that both Mercury and Milam were insolvent on March 14, 1986.

79. The Court further finds that due to regulatory violations the Associations had substantially dissipated their assets by March 14, 1986. The Bank Board relied on the losses related to the five loans appraised as "Loss." Three specific regulations were violated: 12 CRF §§ 563.17–1(c)(14), 563.17–1(c)(iii), and 563.9–3. The first is a requirement that the association determine the financial condition of the borrower; next, appraisal deficiencies; and third, the limitation on loans to one borrower.

80. The Court finds that the determination of the Bank Board that the Associations were in an unsafe and unsound condition to transact business on March 14, 1986, is clearly and convincingly supported by the evidence.

81. Walter L. Faulk, testifying on behalf of the Bank Board, stated that he was responsible for the supervision of Mercury and Milam as a result of his employment as Supervisory Agent for the Dallas Bank.

82. The Court credits the testimony of Faulk that the actions of the Dallas Bank were designed to assure that Mercury and Milam comply with federal regulations.

83. The Court discredits the allegations and the evidence proffered in support thereof that Faulk's action were designed to prevent Mercury and Milam from meeting their regulatory net worth requirements to facilitate some covert takeover plan.

84. Robert R. Torres, the Examiner–in–Charge, is found to be a credible witness. His experience as an examiner and the manner in which he conducted the examinations here at issue, and his demeanor as a witness cause the Court to credit his testimony with respect to loans, investments appraisals, net worth, Bank Board regulations, and the insolvent condition of Mercury and Milam.

85. John B. Haralson, the individual plaintiff, testified, among other things, that Mercury and Milam were not insolvent and would not have been deemed so if the Dallas Bank had permitted him to sell certain assets.

86. The Court does not credit the testimony of Mr. Haralson for many reasons. Among them are his convenient memory—excellent when questioned by his counsel but poor on cross-examination; his demeanor as a witness; his interest in the outcome of the litigation; his inability to admit the true role of Aubin relative to the Associations; and his clearly-stated animosity towards Torres for which the Court found no support other than his self-serving declarations.

87. The three auditor-experts, Seymour, Hargraves, and German, presented conflicting testimony. Based upon their experience and the other evidence of record—both direct and circumstantial—the Court chooses to credit the testimony of German.

88. The Court finds no credible evidence of record that the Bank Board planned, plotted, or otherwise imposed the conservatorship on Mercury or Milam without just cause.

89. There is insufficient evidence of record for the Court to find that plaintiffs were hampered in their preparation or presentation of this case because of a lack of records or inadequate funds.

## CONCLUSIONS OF LAW

This is a civil action arising under federal law pursuant to the provision of Section 5(d)(6)(A) of the HOLA, 12 U.S.C. § 1464(d)(6)(A) and Section 406(c)(1)(B) of the NHA, 12 U.S.C. § 1729(c)(1)(B). Jurisdiction exists and venue is proper by virtue of the provisions of 12 U.S.C. § 1464(d)(6)(A). That section provides in relevant part:

> The grounds for the appointment of a conservator or a receiver for an association shall be one or more of the following: (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members; (ii) substantial dissipation of assets or earnings due to any violation or violations of law, rules, or regulations, or to any unsafe or unsound practice or practices; (iii) an unsafe or unsound condition to transact business.... The Board shall have exclusive power and jurisdiction to appoint a conservator or receiver.

■ The Bank Board, an independent federal agency, 12 U.S.C. § 1437, is charged by Congress with the administration of the HOLA, as amended, 12 U.S.C. §§ 1461–1468, and Title IV of the NHA, 12 U.S.C. §§ 1724–1730. The Bank Board is the operating head of FSLIC, which insures and regulates eligible state and federal savings associations pursuant to Sections 402 and 403 of the NHA, 12 U.S.C. §§ 1725(a), 1726. Congress gave the Bank Board broad authority to regulate insured institutions in order to protect the FSLIC from the risks of business failures. *Haralson v. FHLBB,* 837 F.2d 1123, 1127 (D.C.Cir. 1988); *Woods v. FHLBB,* 826 F.2d 1400, 1411 (5th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988). If, in the *opinion* of the Bank Board, a ground for the appointment of a conservator or receiver exists, the Bank Board is authorized to appoint *ex parte,* and without notice, a conservator or receiver. Section 5(d)(6)(A) of the HOLA, 12 U.S.C. § 1464(d)(6)(A). Once the Bank Board has determined to appoint a conservator or receiver, the procedure for judicial review of that determination is governed solely by Section 5(d)(6)(A) of HOLA, 12 U.S.C. § 1464(d)(6)(A).

The statute directs the reviewing court to "... upon the merits dismiss such action or direct the Bank Board to remove such

conservator or receiver." 12 U.S.C. § 1464(d)(6)(A). Some courts construing these provisions have felt that review under this statute is limited to the administrative record complied by the Bank Board and have required the association to prove that the Bank Board's appointment of a conservator or receiver was arbitrary or capricious. *Woods*, 826 F.2d at 1408–09; *Guaranty Savings & Loan Ass'n v. FHLBB*, 794 F.2d 1339, 1342 (8th Cir.1986); *San Marino Savings & Loan Ass'n v. FHLBB*, 605 F.Supp. 502, 508 (C.D.Cal. 1984); *Washington Federal Savings & Loan Ass'n v. FHLBB*, 526 F.Supp. 343, 350–54 (N.D.Ohio 1981). Others have suggested that the statute seems to require an exercise of *de novo* jurisdiction. *Telegraph Savings & Loan Ass'n v. FSLIC*, 564 F.Supp. 862, 869–70 (N.D.Ill. 1981), *aff'd sub nom.*, *Telegraph Savings & Loan Ass'n v. Schilling*, 703 F.2d 1019 (7th Cir.), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983); *see also Fidelity Savings & Loan Ass'n v. FHLBB*, 540 F.Supp. 1374, 1377 (N.D.Cal.1982), reversed on other grounds, 689 F.2d 803 (9th Cir.1982). In *Telegraph*, after taking this position, the court ultimately decided that to prevail, the association would be required to demonstrate that the financial projections relied upon by the Bank Board were unreasonable. 564 F.Supp. at 874.

■ *Collie v. FHLBB*, 642 F.Supp. 1147 (N.D.Ill.1986), construed the statute to require that the court satisfy itself that the association has had a meaningful opportunity to make a case in opposition to the appointment at some point prior to the appointment. If it did not, the Court should provide that opportunity. *Id.* at 1152. Under the *Collie* analysis, the Bank Board bears the initial burden of showing a reasonable factual basis for its conclusion that any one of the statutory grounds existed. If the evidence is conflicting, the Court must determine whether there were facts from which the Bank Board reasonably could have concluded that one or more of the grounds existed. If, upon the Court's review of the administrative record and any facts proffered by plaintiff in an action filed pursuant to 12 U.S.C. § 1464(d)(6)(A), the Court concludes that the Board could

reasonably have formed the opinion that one or more of the grounds set forth in 12 U.S.C. § 1464(d)(6)(A) existed, then the Court should dismiss the action brought by the association to remove the conservator or receiver. *Collie*, 642 F.Supp. at 1152; *see also Woods*, 826 F.2d at 1406; *Biscayne Federal Savings & Loan Ass'n v. FHLBB*, 720 F.2d 1499, 1503 (11th Cir. 1983); *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984).

The issue, regardless of process, becomes whether the Bank Board had a reasonable factual basis for its opinion that one or more of the statutory grounds existed for the appointment of a conservator or receiver. Thus, the ultimate question is whether one or more of the statutory grounds existed at the time of the appointment of the conservator or receiver. After careful consideration, the Court concludes that the exercise of discretion by the Bank Board to appoint a conservator or receiver for a federally insured association is a determination reviewable under the arbitrary and capricious standard.

■ The administrative record was admitted in evidence as in other administrative cases because a reviewing court should start with the record before the agency. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Plaintiffs' assertion that the record is not "an administrative record" because it is not the result of an adversarial "hearing" is not controlling or supported. In this case, the Bank Board properly compiled an administrative record that clearly demonstrates that it gave a fair and reasoned consideration to the relevant factors before determining that all three of the statutory grounds for appointment of a conservator existed. The administrative record constitutes the basis for the Bank Board's action.

■ The opportunity afforded by Section 5(d)(6)(A) of the HOLA, 12 U.S.C. § 1464(d)(6)(A), to file an action in district court satisfies the constitutional concern occasioned by the lack of an opportunity to be heard prior to the appointment of a conservator or receiver. *Fahey v. Mallo-*

*nee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). After review of the factual basis for the Bank Board's action upon either the administrative record or on the administrative record and the trial record as here, plaintiffs will have had their day in court. Due process requires no more.

A federally-insured association is insolvent if its assets are less than its liabilities to creditors and others, including its members. Based upon the facts found herein, the Bank Board's determination that both Mercury and Milam were insolvent on March 14, 1986, is amply supported in the administrative record and such finding is not arbitrary and capricious. A federally-insured association has suffered a substantial dissipation of assets or earnings due to a violation or violations of law, rules, or regulations or to an unsafe or unsound practice or practices, within the meaning of 12 U.S.C. § 1464(d)(6)(A)(ii), when its assets or earnings have been adversely affected to a significant degree as a result of such a violation or unsound practice. Based upon the facts found herein, the Bank Board's determination that Mercury and Milam had suffered a substantial dissipation as of March 14, 1986, is amply supported in the administrative record and is neither arbitrary nor capricious. An association is in an unsafe and unsound condition to transact business, within the meaning of 12 U.S.C. § 1464(d)(6)(A)(iii), when it is in a weakened financial condition and is controlled by individuals or management who have engaged in a pattern of regulatory violations or unsafe and unsound practices and who are unwilling or unable to conform to applicable rules or regulations, supervisory directives or safe and sound practices. *Woods,* 826 F.2d at 1410. The Court concludes from the facts found that the repeated insider transactions, the modification and extension or problem loans, and the lack of confidence in the management of the associations all support the determination of the Bank Board that Mercury and Milam were in an unsafe and unsound condition to transact business as of March 14, 1986. The Bank Board's conclusion that an association is in an unsafe and unsound condition to transact business is entitled to great weight. *Collie,* 642 F.Supp. at 1154; *San Marino,* 605 F.Supp. at 509.

The Court, based on the Administrative Record and after considering the evidence adduced by plaintiffs and defendants, concludes that there was a reasonable basis in fact for the Bank Board's determinations regarding each of the grounds enumerated in Section 5(d)(6)(A)(i)–(iii) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i)–(iii), and that the Bank Board's decision to appoint the FSLIC as conservator for Mercury and Milam was neither arbitrary nor capricious within the meaning of the APA, 5 U.S.C. § 706(2)(A). Viewing the Bank Board's factual determinations, coupled with all the evidence produced during the trial, and reviewing it under the "substantial evidence" standard, the result is identical. Thus, the Court concludes as a matter of law that the Bank Board has met its burden of proof by demonstrating that the statutory grounds to impose a conservator upon the Associations were met.

In view of the foregoing findings of fact and conclusions of law, judgment will be entered dismissing plaintiffs' action as directed by Section 5(d)(6)(A) of the HOLA, 12 U.S.C. § 1464(d)(6)(A).