MARIETTA FRANKLIN SECURITIES
CO., Plaintiff,

v.

Larry MULDOON, District Director of
the Office of Thrift Supervision,
Defendant.

No. 90–CV–565.

United States District Court,
S.D. Ohio.

July 25, 1991.

Stanley Lee Myers, Columbus, Ohio, for plaintiff.

Albert Raymond Ritcher, Asst. U.S. Atty., Columbus, Ohio, and Elizabeth Moore, Office of Thrift Supervision, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This matter is before the Court upon the motion of the Defendant, Larry Muldoon, District Director of the Office of Thrift Supervision (hereinafter "OTS") to Dismiss or for Summary Judgment filed September 28, 1990. Defendant OTS's motion was submitted the same day with two other filings; namely, a Request for Hearing on Defendant's Motion to Dismiss or for Summary Judgment, as well as a Notice of Filing of the Administrative Record. Plaintiff, Pioneer Federal Savings and Loan Association, (hereinafter "Pioneer")[1] filed a response on October 17, 1990, which was a memorandum contra Plaintiff Office of Thrift Supervision's motion to Dismiss or for Summary Judgment. These two motions were followed by Pioneer's Motion for Temporary Restraining Order and OTS's Response filed October 19, 1990 and Octo-

---

1. Pioneer Savings and Loan Association is not the named plaintiff on the Complaint. However, Pioneer is a state-chartered federally in-sured stock savings association who is 93% owned by Marietta Franklin Securities Co. the named plaintiff herein.

ber 23, 1990 respectively.[2] On November 2 and 7, 1990, Pioneer submitted Corrected Supplemental Memoranda concerning their opposition to OTS's motion to Dismiss/Summary judgment. OTS filed a Reply Memorandum In Support of their Motion to Dismiss or for Summary Judgment on November 21, 1990. Pioneer filed a Response on December 11, 1990, for which in a series of three more motions, the parties disagreed as to whether or not said supplemental memos following OTS's Reply should be permitted. This Court, after reviewing all of the pleadings within this matter, now turns it attention to the issues presented herein.

## FACTS

Pioneer Savings and Loan Association is a state chartered savings and loan association with deposits insured by the Federal Government. On June 29, 1990, the Director of the Office of Thrift Supervision appointed Resolution Trust Corporation ("RTC") as receiver for Pioneer after OTS determined that the institution was in "an unsafe or unsound condition to transact business, including having substantial insufficient capital or otherwise." (AR 3–4); *See also* 12 U.S.C. § 1464(d)(2)(C)(iii). At that same time, the Director of OTS signed orders chartering a new savings and loan association, Pioneer Federal Savings and Loan Association ("New Pioneer") and with New Pioneer's consent, appointed the RTC as conservator for New Pioneer to administer certain of Pioneer's assets. (AR pages 5–10). The Decision and Order of the Director of OTS was based upon the recommendation, memorandum, and supporting materials prepared by the OTS staff. (AR 15–22; 41–48). It was from these concerns that the Director of OTS appointed the RTC as receiver for Pioneer. (AR 41–48).

On August 9, 1989, the United States Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989, ("FIRREA") Pub.L. No. 101–73, 103 Stat. 183. This enactment was an effort by the United States Congress, through the new agencies created, to bring in line and properly address this Country's ever increasing problem of failed financial institutions. FIRREA resulted in many significant changes in both the structure and regulation of savings and loans or "thrift" institutions. The Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC") were both abolished. In their place other agencies, including OTS, took over the functions previously administered by FHLBB and FSLIC. Also created was the Savings Association Insurance Fund ("SAIF") which is maintained under the jurisdiction of the Federal Deposit Insurance Corporation ("FDIC"). SAIF insures deposits within thrift institutions.

OTS is an office within the Department of the Treasury. OTS, acting through its Director, serves as the primary federal regulator of savings associations which are insured by SAIF. 12 U.S.C. § 1463. The Director is vested with the authority to appoint conservators or receivers for trouble savings and loans. 12 U.S.C. § 1464(d)(2)(E). The Director may appoint said conservator or receiver *ex parte. Id.* The Director may appoint said conservator or receiver for state associations if one of six criteria are met. 12 U.S.C. § 1464(d)(2)(C). In this particular case, the Director relied upon 12 U.S.C. § 1464(d)(2)(C)(iii) referenced above.

The RTC is a federal corporation under the management of FDIC. 12 U.S.C. § 1441a(b)(1). The Director of OTS, until August 9, 1992, is required to appoint the RTC as receiver for all failed savings associations. *Id. see also* §§ 1464(d)(2)(H)(ii); 1441a(b)(3)(A). On July 30, 1990, Pioneer and its holding company Marietta filed this action challenging the Director's decision.

## STANDARD OF REVIEW

In considering this motion, the Court is mindful that the standard for summary judgment "mirrors the standard for a di-

---

**2.** See this Court Opinion and Order dated November 5, 1990 in which Pioneer's Temporary Restraining Order was denied.

rected verdict under [Rule 50(a)], which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citing *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943)). Thus, the Supreme Court concluded in *Anderson* that a judge considering a motion for summary judgment must "ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." 477 U.S. at 252, 106 S.Ct. at 2512.

■ Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In essence, the inquiry is whether the evidence presented a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

Such an inquiry necessarily implicates the evidentiary standard of proof that would apply at the trial on the merits. As a result, the Court must view the evidence presented through the prism of the substantive evidentiary burden. Rule 56(e) therefore "requires the nonmoving party to go beyond the pleadings and by their own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file', designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

■ In *Banks v. Rockwell International N.Am. Aircraft Operations,* 666 F.Supp. 1053 (S.D. Ohio 1987) (Graham, J.), this district enunciated the importance of granting summary judgments in appropriate situations by stating as follows: "Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 1056 (citing *Celotex Corp. v. Catrett,* 477 U.S. at 327, 106 S.Ct. at 2555, (quoting Fed. R.Civ.P. 1)); *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

Thus, the mere existence of a scintilla of evidence in support of a plaintiff's claim is insufficient—there must be evidence upon which a jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. Having discussed the Rule 56 standard of review, the Court now turns to the merits.

## LAW AND ANALYSIS

### A. JURISDICTION

■ 12 U.S.C. § 1464(d)(2)(E) provides in pertinent part:

The Director shall have exclusive power and jurisdiction to appoint a conservator or receiver for a Federal savings association. If, in the opinion of the Director, a ground for the appointment of a conservator or receiver for a savings association exists, the Director is authorized to appoint ex parte and without notice a conservator or receiver for the savings association. In the event of such appointment, the association may, within 30 days thereafter, bring an action in the United States district court for the judicial district in which the home office of such association is located, or in the United States District Court for the District of Columbia, for an order requiring the Director to remove such conservator or receiver, and the court shall upon the

merits dismiss such action or direct the Director to remove such conservator or receiver. Upon the commencement of such an action, the court having jurisdiction of any other action or proceeding authorized under this subsection to which the association is a party shall stay such action or proceeding during the pendency of the action for removal of the conservator or receiver.

Within this section, it is specifically stated that "the association may, *within 30 days* thereafter, bring an action ... " *Id.* (Emphasis Added). It is OTS' contention that in filing this action on the thirty first day, (the thirtieth day falling on a Sunday) this action necessarily is time-barred [3] causing this Court to lose jurisdiction. Pioneer vehemently objects.

In support of their claims, OTS relies upon *Hilliard v. United States Postal Service,* 814 F.2d 325, 327 (6th Cir.1987); accord *In re Butcher,* 829 F.2d 596 (6th Cir.1987); *Rust v. Quality Car Corral, Inc.,* 614 F.2d 1118, 1119 (6th Cir.1980). In *Hilliard,* it was found that the thirty day limitation period for seeking review of the Merit System Protection Board was jurisdictional. *Id.* at 327. That being, Civil Rule 6(a) of the Fed.R.Civ.P. excluding Saturdays, Sundays, or legal holidays and permitting the filing the following day thereafter, is inapplicable to cases such as these where jurisdiction and not procedural considerations is at bar. *Id.* citing *Rust* at 1119.

*Rust* found that the Truth in Lending Act's statute of limitations of one year was jurisdictional. *Id.* at 1119. Specifically they stated:

> We believe, however, that defendants have expressed the better view of the relationship between a federal statute and Rule 6(a). The Truth in Lending Act

creates a cause of action and confers jurisdiction on federal courts to hear cases arising under the statute. That jurisdiction is defined and circumscribe by the Act itself, in a temporal as well as substantive sense. If a complaint is not filed within the time period prescribed by 15 U.S.C. § 1640(e), a federal court has no jurisdiction to entertain it.

*Id.* Accord *In re Butcher* at 601 (two year limitations period of Bankruptcy Code provision concerning actions to avoid preferential or fraudulent transfers, 11 U.S.C. § 546(a), runs as of the date of trustee's appointment and expires within 24 months thereafter, regardless of whether the last day falls on a Saturday, Sunday or legal holiday).

Finally, OTS cites to *First Savings & Loan Ass'n v. First Federal Savings & Loan Ass'n,* 547 F.Supp. 988 (D.Haw.1982) which held that an action to remove a receiver filed thirteen months after the appointment of the receiver was untimely. *Id.* at 995. 12 U.S.C. § 1464(d)(6)(A), which was the predecessor to § 1464(d)(2)(E), required the same thirty day statutory time frame upon which to oppose a receiver.[4] The Court stated:

> ... I find that where federal statutes create a new right of action and then prescribe a time within which that action is to be brought, any failure to commence the action within the applicable time period extinguishes the right itself and divests the federal court of any subject matter jurisdiction which it otherwise might have.

*Id.* at 995; citing, *Fenton v. Citizens Savings,* 400 F.Supp. 874 (C.D.Mo.1975); *Cleveland v. Douglas Aircraft,* 509 F.2d 1027 (9th Cir.1975); and, *Park County, Montana v. United States,* 454 F.Supp. 1,

---

**3.** The Director of OTS appointed a receiver for Pioneer on June 29, 1990. Inasmuch, thirty days thereafter would necessarily be July 29, 1990; not July 30, 1990, the date of the filing within this matter.

**4.** 12 U.S.C. § 1464(d)(6)(A) read in pertinent part:

> ... The Board shall have exclusive power and jurisdiction to appoint a conservator or receiv-

er. If, in the opinion of the Board, a ground for appointment of a conservator or receiver as herein provided exists, the Board is authorized to appoint ex parte and without notice a conservator or receiver for the association. In the event of such appointment, the association may, within thirty days thereafter, bring an action ...

2 (D.Mont.1978). OTS contends that if you combine *First Savings* with *Hilliard, Rust,* and *In re Butcher,* this Court clearly is without jurisdiction to entertain the matter at hand. Pioneer's failure to file this matter within thirty days removes this Court's jurisdiction. Fed.R.Civ.P. 6(a) cannot save this cause of action. OTS seeks a dismissal.

Pioneer objects and urges this Court to look at other circuits for our analysis. According to Pioneer, this action could have been maintained in this district court where the action has, in fact, been commenced. Alternatively, this matter could have been filed in the D.C. court. If this matter had been filed in the D.C. court, the 6th Circuit reliance upon jurisdiction would not be binding.[5] Therefore, to bar this matter based upon case law which has not been upheld uniformly throughout all of the circuits would be an injustice to Pioneer. Congress could not have intended to base jurisdiction upon the location of the original filing. That being, Pioneer urges that OTS' motion to dismiss or for summary judgment based upon jurisdiction be denied.

Pioneer relies upon a series of cases which have either disagreed with the analysis of the above referenced cases or has distinguished the cases from other statutory causes of action. In *United Mine Workers of America, International Union v. Dole,* 870 F.2d 662 (C.A.D.C.1989), it was held that time periods, including jurisdictional time periods, are to be construed in accordance Fed.R.App.P. 26(a), excluding final weekend days and holidays unless a specific statutory provision requires otherwise. *Id. citing, Funbus Systems v. California Public Utilities Commission,* 801 F.2d 1120, 1124 (9th Cir.1986) (time for appealing ICC construed in accordance with Fed.R.App.P. 26(a)); *Miller v. U.S. Postal Service,* 685 F.2d 148 (5th Cir.1982) *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983) (Fed.R.App.P. 26(a) applies to appeal from Merit Systems Pro-

tection Board); *cf. Frey v. Woodard,* 748 F.2d 173, 174–76 (3rd Cir.1984) (Fed. R.Civ.P. 6(a) applies to time for filing tort claims against U.S.); *In re Gotham Provision Co.,* 669 F.2d 1000, 1012–14 (5th Cir. 1982), *cert. denied sub nom. First State Bank of Miami v. Gotham Provision Co.,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982) (Fed.R.Civ.P. 6(a) applies to time for filing notice of claim with agency); *Kane v. Douglas, Elliman, Hollyday & Ives,* 635 F.2d 141 (2nd Cir.1980) (Fed.R.Civ.P. 6(a) applies for time to file a Title VII claim); *Wirtz v. Pennsylvania Shipbuilders Association,* 382 F.2d 237 (4th Cir.1967) (Fed. R.Civ.P. 6(a) applies to time for filing labor-management claim); *Johnson v. Flemming,* 264 F.2d 322, 323 (10th Cir.1959) (Fed.R.Civ.P. 6(a) applies to time for filing appeal under Social Security Act); *Simon v. Commissioner of Internal Revenue,* 176 F.2d 230, 231–32 (2nd Cir.1949) (Fed. R.Civ.P. 6(a) applies to time for filing appeal from Tax Court).

Relying further upon *Johnson v. Burnley,* 887 F.2d 471 (4th Cir.1989), Pioneer states that the *Burnley* court specifically refuted the reason presented in *Hilliard. Id.* at 476. The Court added further that neither the legislative history nor the plain language of 5 U.S.C. § 7703(b)(2) (Review of a decision of the Merit System Protection Board) shows an intent to impose a 30 day jurisdictional barrier to suit. *Id.* In *Krajci v. Provident Consumer Discount Co.,* 525 F.Supp. 145 (E.D.Pa.1981), the Court specifically rejected the *Rust* analysis of Rule 6(a) in ruling upon 15 U.S.C. § 1640(e) (Truth in Lending Act). *See also McMillon v. Budget Plan of Virginia,* 510 F.Supp. 17 (E.D.Va.1980). Inasmuch as there is such a clear split in the circuits, not to mention the specifically stated disagreement between the 6th and D.C. Circuits on jurisdiction in these types of cases, Pioneer stresses that this Court not find their complaint pursuant to 12 U.S.C. § 1464(d)(2)(E) time barred.

---

**5.** Pioneer throughout their motion continuously references Fed.R.Civ.P. 26(A). This Court will approach this case as one of a "complaint" thereby invoking Rule 6(a) of the Fed.R.Civ.P. instead of 26(a) of the Fed.R.App.P. However, for purposes of this opinion, the language and effect of these two sections is identical.

While this Court recognizes its duty to follow the precedents established within the 6th Circuit, it must decline to do so herein. It is true that the 6th Circuit has held on more than one occasion that Fed. R.Civ.P. 6(a) is not to be construed in favor of statutory time frames where Congress has given no indication that procedural rules are to be applied. Yet, the Court finds Pioneer's argument compelling when they state that Congress could not have intended jurisdiction to be predicated upon where the association happens to bring suit. Inasmuch as this matter could easily have been filed within either the United States District Court for the District of Columbia or in the district court in which the home office of the association is located, it cannot be said that Pioneer, by being unfortunate to have their home office in the Southern District of Ohio, is barred by the Circuit's split on the jurisdiction issue. Congress could not have contemplated such and the drafters of this statute necessarily must have been aware of the litigation which these type of statutory time frames have caused. However, even if the drafters were not so aware, nothing in the language indicates to this Court that Congress specifically is excluding Fed.R.Civ.P. 6(a) from consideration. To put it another way, it does not appear to be Congress' sole intent to place jurisdiction within the courts only after 30 days, if all attempts are made to file the case within thirty days. Civil Rules excluding Saturdays, Sundays, and legal holidays are rules of convenience. It is only logical that if the last day of any filing period falls on a day when the parties could not avail themselves to the court, even if they were so inclined, that they should thereafter be forever barred from properly prosecuting their claim. The rule limits the filing of an "appeal" of the decision of the Director to thirty days. Here, the parties attempted such by filing their complaint on the first available day following a court which was closed to the public on Sunday. In this Court's opinion, if Congress wanted any other result, they could have specifically addressed the issue by utilizing unequivocal language to deny the use of common procedural rules designed to accommodate both the parties and the courts. Without any indication to the contrary, this Court will hold the claim properly filed. Those cases referenced above by OTS have either been specifically disputed by other jurisdictions when called upon by other courts or the time of delay by the parties was well-beyond the time constraints of Rule 6(a) of the Federal Rules of Civil Procedure or Rule 26(a) of the comparable Appellate Rules. (*See First Savings* at 995 where the Court ruled that a 13 month delay in filing a 12 U.S.C. § 1464(d)(6)(A) charge was untimely). The Court in *First Savings*, however, was not confronted with a Rule 6(a) situation. [*See also Womble v. Dixon*, 585 F.Supp. 728, 733 (E.D.Va.1983) (Shareholders of a defunct savings and loan who did not request removal of until six months after the appointment of a receiver is time barred)]. Therefore, this Court declines OTS' request to dismiss this case for want of jurisdiction and OTS' motion as it so relates is DENIED.

## B. THE ADMINISTRATIVE RECORD

12 U.S.C. § 1464(d)(2)(E) provides for judicial review of the decision of the Director for the appointment of a receiver or conservator. However, nowhere within that section, did Congress specifically spell out what the scope of the judicial review should be. Congress instead indicated only that "... and the court shall *upon the merits* dismiss such conservator or receiver ..." *Id.* (Emphasis added). Therefore, the parties within this matter again dispute the scope of review that this Court should undertake. OTS would have this court review the Administrative Record, as filed herein, and find for the appointment by the Director, unless said actions were clearly arbitrary or capricious. Alternatively, Pioneer would prefer a supplementation to the filed Administrative Record and if this Court were so inclined, a full evidentiary hearing. Secondarily, Pioneer would recommend that the holding in *Collie v. Federal Home Loan Bank Board*, 642 F.Supp. 1147, 1150–52 (N.D.Ill.1986) be applied. *Collie* allowed for a "hybrid" type of review upon the merits by determining

whether the action of the FHLBB was arbitrary or capricious, but only after an expanded record was submitted. *Collie,* in essence, falls in the middle of the two approaches which have been allowed throughout the various circuits. Some circuits have permitted only a review of the administrative record properly compiled and filed before the tribunal. Others provide for a full *de novo* review. The Court will now address these varying approaches *seriatim.*

### 1. THE ARBITRARY AND CAPRICIOUS STANDARD

 It is generally recognized that a failed financial institution which is challenging the appointment of a receiver or conservator has the burden of proving that the statutory grounds for the appointment did not exist. *Woods v. FHLBB,* 826 F.2d 1400, 1408–09 (5th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988); *Guaranty Savings & Loan Ass'n v. FHLBB,* 794 F.2d 1339, 1342 (8th Cir. 1986); *San Marino Savings & Loan Ass'n v. FHLBB,* 605 F.Supp. 502, 508 (C.D.Cal. 1984); *Telegraph Savings and Loan Ass'n v. FSLIC,* 564 F.Supp. 862, 870 (N.D.Ill. 1981). Likewise, said challenger associations must show that the Director's exercise of his or her discretion in deciding upon the appointment was arbitrary or capricious. *Woods,* at 1408; *Guaranty,* at 1342.[6] The purpose of the rule is to have the court focus its attention "... not with the reasonableness or wisdom of the Board's conduct, but only with the question of whether the requirements of Section 1729(c)(2) existed at the time [the associa-

tion] passed into receivership." *Biscayne Federal Savings & Loan Ass'n v. FHLBB,* 720 F.2d 1499, 1504 (11th Cir.1983) *citing Telegraph Savings & Loan* at 870; *accord, Guaranty* at 1342; *Alliance Federal Savings & Loan Ass'n v. FHLBB,* 782 F.2d 490, 493 (5th Cir.), *modified on other grounds,* 790 F.2d 34 (5th Cir.1986); *Haralson v. FHLBB,* 721 F.Supp. 1344, 1353 (D.C.Cir.1989). The court's attention must also be in accord with the understanding that immediate action may be necessary to minimize the economic loss to an associations customers which may be incumbent in a situation where an institution faces troubled or failing financial affairs. *Biscayne* at 1503. That being, courts are given very limited jurisdiction to ascertain only whether a statutory ground exists to support the Board's action. *Id.* at 1504. "The wisdom of the Board's decision to exercise its power of receivership is an issue that Congress has vested in the Board and is an issue 'not subject to re-examination in the federal courts under the guise of judicial review of agency action.'" *Telegraph Savings & Loan* at 875, *quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1977).

 The ultimate issue before this Court can best be characterized with that presented in *San Marino.* Has Pioneer "sustained the burden of proving that the [Bank] Board (here OTS) abused its discretion in reaching its 'opinion' that a [conservator] should be appointed." *Id.* at 508; (interlineation ours), *quoting, Washington Federal Savings and Loan Association v.*

---

6. This Court is mindful that this is the well defined uncontroverted standard of review created by § 706 of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), (B), (C) and (D), in reviewing agency decisions by appellate tribunals. There is, however, a split of authority as to whether the standard herein (as well as the former 12 U.S.C. § 1464(d)(6)(A)) is truly an arbitrary or capricious standard. Some courts have held that the standards are similar. Others have held that no arbitrary or capricious standard needs to be applied. In those jurisdictions not applying the arbitrary or capricious standard, they state that the reviewing court should determine only if any statutory grounds existed

for the appointment. For purposes herein, this Court feels that the difference is not critical. If at the time of the Director's decision to appoint a receiver or conservator, there were no statutory grounds upon which to make the appointment, then it would be clearly arbitrary or capricious for him to have made said appointment. Therefore, it does not matter whether you call it an arbitrary or capricious standard or a review to determine if a statutory ground existed upon which the Director could have relied. The outcome would be the same with the appointment being set aside if there were no statutory grounds upon which to find for the appointment.

*FHLBB,* 526 F.Supp. 343, 349 (N.D.Ohio 1981). In making this determination, the standard is contained in footnote 6. *See also Washington Federal* at 350. Administrative action may be regarded as arbitrary or capricious only where it is not supported by any rational basis and mere error is insufficient. *San Marino* at 508. *See also Union Oil Co. v. EPA,* 821 F.2d 678, 684 (D.C.Cir.1987). To have administrative action set aside as arbitrary or capricious, the party challenging the action must prove that it was wilful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case. *San Marino* at 508, *quoting, First National Bank of Fayetteville v. Smith,* 508 F.2d 1371, 1376 (8th Cir.1974) *cert. denied,* 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975) (citations omitted). The Court is not empowered to substitute its judgment for that of the agency, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Woods* at 1409; nor to determine if a lesser remedy would have been appropriate. *San Marino* at 509, *citing, Fidelity Savings and Loan Ass'n v. Federal Home Loan Bank Board,* 689 F.2d 803, 809 (9th Cir.1982); *Biscayne* at 1504. Notwithstanding this deference, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (*quoting, Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). The question as to whether an agency has acted in an arbitrary or capricious manner turns on the extent to which the relevant statute restricts the agency's discretion.[7] *Kreis v. Secretary of the Air Force,* 866 F.2d 1508, 1514 (D.C.Cir.1989). Finally, the Director's actions are entitled to a presumption of validity. *American Financial Services Ass'n v. FTC,* 767 F.2d 957, 985

(D.C.Cir.1985) *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986); *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981). This presumption is not necessarily lost merely because the agency acts *ex parte. Telegraph* at 870, *citing, Overton Park* 401 U.S. at 415–16, 91 S.Ct. at 823.

The parties to this action have not been in general dispute over the arbitrary or capricious standards which have been articulated above. Both parties agree that the Court is to view this matter in accord with those principles cited. Where the parties have met with divergent views has been in the area of the scope that this Court should undertake in determining whether the Director was arbitrary or capricious as to his placing Pioneer into receivership. The Court, therefore, will now turn its attention to the scope and depth that should be maintained in reviewing cases "upon the merits" pursuant to 12 U.S.C. § 1464(d)(2)(E).

**2. SCOPE OF REVIEW OF THE ADMINISTRATIVE RECORD**

OTS would have this Court review only the Administrative Record filed within this matter and determine that ample evidence supports the Director's decision concerning Pioneer. Pioneer would prefer a *de novo* review of OTS' decision, but apparently has conceded, that at a minimum, a more expansive review than that proposed by OTS should be considered. Pioneer appears to like the approach taken in *Collie supra.* After a thorough review of the multitude of cases concerning the role of court review permitted within this area, this Court finds that a *de novo* review is not in accord with the mandates of Congress in 12 U.S.C. § 1464(d)(2)(E) in requiring a "upon the merits" analysis. However, this Court also is as equally unconvinced that a review is only to be based upon the Administrative Record filed in these types of proceedings. While it does not appear that a full evidentiary hearing is required, the Court feels that the parties

---

**7.** As readily seen above, 12 U.S.C. § 1464(d)(2)(E) grants very broad discretion in the Director to "have exclusive power and jurisdiction to appoint a conservator or receiver for a Federal savings association."

should be able to supplement the Administrative Record, to the extent that said supplementation would augment or clarify the Administrative Record to reflect that evidence the Director had before him *at the time of making his decision.* (emphasis ours). Therefore, this Court adopts the decision in *Collie v. Federal Home Loan Bank Board,* 642 F.Supp. 1147, (N.D.Ill. 1986) for purposes of the depth of the review to be applied herein.[8]

OTS cites numerous cases for their belief that this Court's reviewing ability is limited to that of the Administrative Record. The lead cases upon which they rely are found in the appellate level. Specifically, OTS points strongly to: *Woods v. Federal Home Loan Bank Board,* 826 F.2d 1400 (5th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988); and, *Guaranty Savings & Loan Ass'n v. FHLBB,* 794 F.2d 1339 (8th Cir.1986). In *Woods* it was held that review was limited to the administrative record and not to be conducted *de novo* as plaintiff therein would have liked. *Id.* at 1408. The *Woods* Court found:

> In sum, a practical analysis of § 1464(d)(6)(A) establishes that Congress did not intend for the district court to review the Bank Board's decision *de novo,* but rather that the decision be reviewed on the basis of the administrative record in accordance with the APA's 'arbitrary and capricious' standard of review. *Id.*

*Guaranty* found the same to be true in stating, "[a]ccordingly, we conclude that the district court correctly restricted its review to the administrative record." *Id.* at 1342. These two tribunals relied heavily upon the conclusions drawn by the Supreme Court of the United States in either *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241,

36 L.Ed.2d 106 (1973), or *United States v. Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

In *Camp,* the Supreme Court limited *de novo* review of agency actions under § 706(2)(F) to situations, "where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions." *Id.* 411 U.S. at 142, 93 S.Ct. at 1244, *citing, Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The *Woods* Court found that the situation involved within their case was very similar to that found in *Camp. Woods* at 1408. In *Camp,* the Comptroller of the Currency was statutorily authorized to deny an application for authorization to organize a new bank without a formal hearing. Review therein was to be made to the district court under the arbitrary and capricious standards and not *de novo. Id.* at 142, 93 S.Ct. at 1244.

In *Bianchi,* it was held:

> ... where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no *de novo* proceeding may be held. *Tagg Bros. & Moorhead v. United States,* 280 U.S. 420 [50 S.Ct. 220, 74 L.Ed. 524 (1930) ]; *National Broadcasting Co. v. United States,* 319 U.S. 190, 227 [63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943) ]. *Id.* 373 U.S. at 715, 83 S.Ct. at 1413.

*Guaranty* relied upon *Bianchi* in holding that inasmuch as 12 U.S.C. § 1464(d)(6)(A) does not specifically define the scope of the review to be conducted and since plaintiff therein did not contend that any of the

---

8. It has also become readily apparent that a uniform resolution is needed for these statutory sections. To the extent that this Country continues to face more and more failed savings associations, more and more challenges to the appointment of receivers or conservators will be maintained. The President, at the time of the drafting of this Opinion, has just permitted another 30 billion dollars to finance the S & L crisis. To have such a range of disagreement as to what standard should be applied in reviewing the record is unproductive. The review accorded a saving association's challenge to the appointment of a receiver or conservator should be uniform and consistent. The review afforded the challenging association should not be predicated upon where the association happens to be located or where they happen to bring suit.

exceptions to the APA should be applied, the district court's restricted review to the administrative record was proper.[9] *Guaranty* at 1342. OTS would further argue that in 1966, three years after the *Bianchi* decision, Congress enacted the Financial Institutions Supervisory Act ("FISA"), Pub.L. No. 89–695, 80 Stat. 1028 (1966). In implementing FISA, Congress removed all reference to "weight of the evidence" found in earlier versions of 12 U.S.C. § 1464(d)(2), and replaced it with the "upon the merits" language. According to OTS: "In view of *Bianchi* and the presumption that 'our elected officials, like other citizens, know the law', *Cannon v. University of Chicago*, 441 U.S. 677, 696–97 [99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560] (1979), Congress' failure to specify a particular standard of review in FISA indicates that Congress intended that judicial review of the appointment of a receiver should be limited to the administrative record, applying the arbitrary and capricious standard." (OTS Motion for Summary Judgment p. 13).

A few jurisdictions have permitted a full *de novo* review. In *Telegraph Savings and Loan* they stated: "[w]hile we therefore find that plaintiff is entitled to *de novo* hearing 'on the merits', we also agree with defendants that the 'merits' are limited to the issue of whether the Board had statutory authority to appoint the FSLIC receiver." *Id.* at 870. *Telegraph* was also concerned that it was clear that their finding for a *de novo* hearing was predicated not upon the APA and 5 U.S.C. § 706, but instead upon their reading of 12 U.S.C. § 1464(d)(6)(A). *Id. see* f.n. no. 8. *See also Fidelity Savings & Loan Ass'n v. FHLBB*, 540 F.Supp. 1374 (D.C.Cal.1982). As fully discussed above, this Court does not take this view. Congress has not specifically specified the scope of review that the reviewing tribunal should take. In those

cases in the past, Congress' failure to so designate the means of review has been interpreted to mean a non *de novo* review following the arbitrary and capricious standards of the APA. And while it does not matter whether you call it arbitrary or capricious in violation of the APA or that the Director did not have statutory authority to appoint a receiver or conservator, (see footnote no. 6), this Court must still follow those precedents firmly established by the Supreme Court of the United States. Therefore, *de novo* review is clearly, without a specific indication by Congress to the contrary, not applicable herein. To grant a full evidentiary *de novo* review would circumvent the intent of Congress in placing broad and encompassing powers in OTS (or formerly the Board). This Court is not to substitute its judgment for that of the Agency. We are not to determine if a more equitable solution could have been made. Instead, the reviewing court is to determine if the decision of the Director was over encompassing, arbitrary, capricious or done so without statutory grounds. These determinations do not need a full evidentiary hearing in order to be determined. However, in order to properly address the role a Court should take, the final approach taken in *Collie*, needs to be analyzed.

This Court has already indicated that we are adopting *Collie* for purposes of the scope of review to be applied in determining whether the decision of the OTS Director in appointing a receiver for Pioneer was proper. While this Court does in fact adopt *Collie*, it must be stated that it does so only as a means to clarify what the proper role a reviewing court should take. In fact, in this Court's opinion, *Collie* is not at all in contravention with those authorities cited above which do not permit *de novo* analysis. *Collie* is not an aberration

9. 5 U.S.C. § 706(2)(F) of the APA has been interpreted by the Supreme Court as authorizing *de novo* review, "when the action is adjudicatory in nature and the agency fact finding procedures are inadequate" and "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action". *See Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823, *Camp*, 411 U.S. at 141–142, 93 S.Ct. at 1243–44.

As adequately demonstrated in both *Overton Park* and *Camp*, these exceptions apply no more within this case than they did therein. There is no credible evidence by Pioneer that there was inadequate factfinding procedures by OTS, only that they do not agree with their conclusion. Likewise, this Court is not being employed to enforce any decision of OTS. Quite obviously, the very opposite is the basis of this action.

of those principles stated in either the Supreme Court cases nor to the other circuit and district court opinions. Instead, *Collie* merely adds to the focus which should be made of the administrative record.

In *Collie*, the Court found that a reasonable reading of "upon the merits" was not to be read so narrowly as to permit the FHLBB (today OTS) to control all the evidence which would reach the district court. *Id.* at 1151. They reasoned that "upon the merits" was a contrast with the usual review of "on the record". And, since Congress in creating the statute, did not necessarily require an adversarial hearing, a hearing might not be held. *Id.* Since a hearing might not be held, it would only follow that an administrative record might not exist. Therefore, to confine the hearing to that of the nonexistent administrative record, could not have been in Congress' contemplation. *Id.* Alternatively, *Collie* also does not go so far as to require "upon the merits" to mean a *de novo* review. *Id.* This was so, because Congress had charged the FHLBB with the enforcement of the various laws and regulations in an effort to protect depositors and to preserve public confidence in thrift institutions. The FHLBB's opinion that insolvency, violations or unsound practices was entitled to some weight. *Id.* If an administrative record exists, the court did not need to construct it anew, with the Board's findings being entitled to a presumption of correctness, if the facts were in dispute. *Id.* (citations omitted). Therefore:

> In light of this legislative history and case law, we think that review 'upon the merits' means two things. First, it means that the court should be satisfied that the association has had a meaningful opportunity to make a case in opposition to the appointment of a receiver at some point during the process leading to the appointment. If it has not, then the court should provide that opportunity. If it has, however, the court need not offer another.
>
> Secondly, the Board should be able to show a reasonable factual basis for its action. Since review is limited to whether the Board had the authority to act, the

burden would be met by a showing that any one of the statutory grounds for the action in fact existed. *Biscayne,* 720 F.2d at 1504; *Telegraph [Sav. and Loan Ass'n v. Schilling* ], 703 F.2d [1019] at 1026 [7th Cir.1983]; *Fidelity,* 689 F.2d at 809. If the evidence at the time of the Board's action was conflicting, the question is whether there were facts from which the FHLBB could have reasonably concluded that one or more of the statutory grounds triggered its authority to act existed. *Biscayne,* 720 F.2d at 1504; *Telegraph,* 703 F.2d at 1028; *San Marino,* 605 F.Supp. at 508; *Washington,* 526 F.Supp. at 393.

*Collie* at 1152. With this standard properly addressed, the Court will now address Pioneer's challenge to the appointment of the receiver herein.

### 3. MERITS OF OTS' DECISION TO APPOINT A RECEIVER

On June 29, 1990, the Senior Deputy Director of OTS, Johnathan L. Fiechter, signed Order No. 90–1301 placing Pioneer Savings and Loan Company under receivership and in the hands of the RTC. AR–3, 23. It was determined that Pioneer "(1) ... is in an unsafe and unsound condition to transact business due to having substantially insufficient capital, and that the Association has negative tangible capital, and that a ground for the appointment of a receiver for the Association therefore exists under § 5(d)(2)(C)(iii) of HOLA, as amended, and (2) [t]he Director, upon consideration of the administrative record, further hereby finds and determines that the Association has suffered a pattern of consistent losses." AR 3–4. As fully discussed above, Pioneer has the duty to come forth with evidence sufficient to challenge the action of OTS in order to set aside the appointment of a receiver or conservator. *See San Marino* at 508.

A. Pioneer asserts that any review within this case is limited to, "... whether Pioneer Savings & Loan, was substantially under-capitalized on June 26, 1990 such that the takeover on June 29, 1990 was in accordance with the law." (Pioneer's Memorandum Contra OTS' motion to Dismiss or for Summary Judgment p. 19). Pioneer

agrees that there is no issue as to whether or not the OTS took over operation of Pioneer on June 29, 1990. Likewise, Pioneer states that they had operated for over a long period of 23 years without difficulty. Accordingly, Pioneer's problems stem from three participation loans which they entered with Bright Banc in Texas. Pioneer was the participating lender in said loans and Bright Banc went into default. OTS appointed the RTC for Bright Banc and RTC's subsequent failure and refusal to pay over the monies due to Pioneer has caused the capital problems herein. *Id.* Therefore, Pioneer alleges that it is arbitrary and capricious for OTS and RTC to have withheld $400,000 in funds legitimately owed to Pioneer by Bright Banc and then also claim that Pioneer is capital-deficient.

As to the other errors of OTS, Pioneer claims that OTS' computation of "adjusted capital" as of June 15, 1990, represents an understatement of Pioneer's capital by $315,000. Pioneer computes their capital to have been approximately $267,000 which is arrived at by subtracting the $315,000 in understated capital from that of OTS' starting point of a negative capital for Pioneer of $48,000. Further, Pioneer's independent auditors, Dixon, Francis, Davis & Oneson, Inc., determined that Pioneer's capital could not be stated properly at any other time than at the end of the month. Pioneer claims that they utilized an accrual method of accounting and thereby booked the majority of their expenses at the beginning of the month with income booked at the end of the month. In addition, the OTS District Office in determining Pioneer's "adjusted capital" improperly relied upon a preliminary audit report. The preliminary report contained a $105,000 error.

OTS concluded in a June 27, 1990, "addendum to the S memorandum" that Pioneer's capital was a negative $350,109. (AR–202). OTS determined that it was inappropriate to book as profit $301,362 which resulted from transactions which were prohibited by OTS Regulation 563.41 and ordered to be reversed by the Ohio Department of Commerce, Division of Sav-

ings and Loan Associations and OTS. *Id.* Pioneer claims, however, that it was improper for OTS to exclude these transactions for purposes of determining Pioneer's capital when later these same transactions were acknowledged to be in the best interests of the institution following its takeover and control by the RTC. *See* Pioneer's Supplemental Memorandum, Docket No. 21, Exhibits 9A and 9B. Further, although OTS indicated that Pioneer did not improve their capital position when directed to do so by the various regulators, Pioneer states that the Affidavits of the Directors of Pioneer indicate otherwise, namely:

1. Pioneer increased its capital in May, 1990 by $290,000;

2. Pioneer increased its capital in June, 1990 by 402,000;

3. Between May 16, 1990 and June 21, 1990, Pioneer increased its capital by a total of 692,000;

4. All charge-offs suggested by FDIC, according to general accepted accounting principles (GAAP) and Dixon, Frances, Oneson audit adjustments for December 31, 1989 according to GAAP were booked by June, 1990.

5. Pioneer Savings & Loan was fully capitalized by June 21, 1990; and,

6. The seizure by OTS on June 29, 1990 prevented the transfer by Pioneer's officers of the funds in certain accounts to satisfy Pioneer's risk capital needs.

Pioneer had submitted two capital plans the purpose of which was to improve its capital position. The January 8, 1990, submitted proposal was rejected by OTS on January 29, 1990. (AR–17, 19). Pioneer submitted another plan on March 28, 1990, for which they claim there was no rejection by the regulators. It was in reliance thereof that Pioneer attempted to improve their capital position as outlined above. Pioneer asserts that they and their directors understood the need to protect the public and the deposit insurance funds. Therefore, what they were attempting to achieve with their proposed capital plan(s) was a "private" bail-out with Pioneer's parent, Marietta Franklin Security Co.

Finally, Pioneer states that at the time the OTS seized their assets, Pioneer had met its risk and core capital requirements. This is so because not included within Pioneer's "adjusted capital" were the following errors, the net effect was to understate capital by $243,000 as follows:

| | | |
|---|---|---|
| 1. | Unverified loss from June 1, 1990, through June 15, 1990 | $ 17,000 |
| 2. | Incorrect REO evaluations | $105,000 |
| 3. | Contra assets adjustments | $ 28,000 |
| 4. | Elimination of loan reserve | $ 93,000 |
| 5. | Misc. Dixon, Francis, Davis & Oneson, CPA's Audit Adjustments for December 31, 1989 | $ 36,000 |
| 6. | Young Loan | $ 36,000 |
| | TOTAL: | $315,000 |

With all of the above, Pioneer stresses that they were fully and adequately capitalized at the time of OTS seizure and subsequent RTC appointment. Pioneer had the required core and tangible capital of $234,000 to $265,000 so needed to be adequately capitalized. That being, Pioneer indicates that their affidavits and exhibits clearly demonstrate that they were fully capitalized on the date of OTS' takeover. Since they met any core and tangible requirements, it was clearly arbitrary, capricious, and not otherwise in accordance with the law for OTS to have appointed the RTC a conservator for Pioneer.

B. Contrary to Pioneer's claims, OTS has stated that Pioneer was in need of a conservator or receiver and that the appointment was in accordance with permissible law. According to OTS:

The Director based that decision on numerous factors, including the findings of OTS' July 24, 1989 comprehensive examination, AR 49; the FDIC's April 1990 examination, AR 43; the OTS' April 24, 1990 field visit, AR 180, 49; another OTS field visit on June 26, 1990, AR 18; the Ohio Division of Savings and Loan Association's directive that Pioneer increase capital, AR 180; financial reports prepared by Pioneer, AR 105; and the independent auditor's report. The independent auditors found that Pioneer's liabilities exceeded assets by $424,000—and that Pioneer accordingly had *negative* $424,000 of shareholder equity—AR 209, 214, 18; that the institution was in a 'dire financial position' AR 242; that Pioneer's 'losses ... have completely eroded the company's capital structure,' AR 239; and that 'the Company may be unable to continue in existence.' AR 209. In fact, Pioneer itself reported in its March 1990 Thrift Financial Report that its core capital was deficient by $256,000, and that its risk-based capital was deficient by $70,-000. AR 113, 115. These figures, moreover, do not even include all the negative adjustments to capital that the regulators and the independent auditors found necessary. (Emphasis in original)

(OTS' Reply Memorandum in Support of Defendant Director's Motion to Dismiss or for Summary Judgment pp. 13–14).

Federally insured institutions are required to meet three separate measures of capital. These three levels include: tangible capital, core or leverage capital, and risk-based capital. 12 U.S.C. § 1464(t); *see* 12 C.F.R. § 567.2 (1990). OTS determined that as of June 15, 1990, Pioneer was operating with negative tangible capital of $350,109. According to OTS, this was $466,000 less than the amount of tangible capital that an association with 7.8 million dollars in assets would be required to maintain. AR 15–18. These figures were derived from a field examination of June 26, 1990, as well as additional findings which were contained in a 1989 year-end audit report prepared by Pioneer's independent, outside auditors, Dixon, Francis, Davis & Oneson, Inc. Accordingly, Dixon, Francis found that Pioneer, as of year-end 1989, had liabilities exceeding assets by $424,000.[10] AR 18,

---

10. This independent audit report is a source of further controversy between the parties. According to OTS, a copy of this report is contained in the Administrative Record between pages 207–46. Yet, this report was compiled only after repeated directives of OTS and enforcement action had commenced. AR 45–46. Further, as of the date of the appointment of the receiver, Pioneer had not submitted the audit. AR 18. Consequently, OTS received a copy of the audit at their June 1990 field visit at which point Pioneer's management had still neither

209. In 1987, 1988 and 1989, Pioneer sustained net income losses of $15,000, $210,000 and $753,000 respectively. AR 19, 42. In the first quarter of 1990, Pioneer was mounting a net loss of $44,000. *Id.* And, OTS will contend that while as of June 15, 1990, Pioneer's books reflected a net income of $76,731, this positive income figure was only achieved through a one-time sale of Pioneer's stock in the Federal Home Loan Mortgage Corporation for $125,883. However, Pioneer had not obtained the requisite supervisory approval before selling said stock, which was required by OTS Regulatory Bulletin RB–2. AR 203. These stated losses were in large part due to the three participation loans referenced above in addressing Pioneer's claims.

OTS states that the participation loans were purchased by Pioneer in 1983 and 1984. All three participation loans were purchased as subparticipations from Citizens Building, Loan & Savings of Mt. Vernon, Ohio. Citizens Building, Loan & Savings was another financial institution owned and controlled by A. Patrick Tonti. As of March, 1990, Pioneer had placed all three loans into "Real Estate Owned" ("REO") and was carrying them at a book value of $1.6 million, net of $1.1 million in specific valuation allowances. This specific valuation allowance indicated that Pioneer had already reserved $1.1 million in losses associated with the three participation loans. AR 42. *See also* OTS Motion for Summary Judgment, page 16, f.n. 9. Moreover, OTS' Cincinnati District Appraiser reviewed a new appraisal Pioneer had received on one of the three parcels. The "Young" parcel had a Net Realizable Value ("N.R.V.") calculation that translated into additional losses of $454,000, which would further reduce the net book value of Pioneer's interest. AR 42, 66. N.R.V. is required by Generally Accepted Accounting Principles.[11] Therefore, during an April 1990 field examination, OTS examiners concluded that the three participation loans "continued to have a major impact on Pio-

neer's viability," and, the district office concluded that "[t]he significant impact of the non earning assets has made it virtually impossible for Pioneer to become profitable." AR 50, 42.

OTS stresses further that not only were they concerned about Pioneer's stability and ability to continue into the future, but so were other entities. Accordingly, the Ohio Division of Savings and Loan Associations issued a "capital call" to Pioneer to increase the association's capital level "to an amount which insures compliance with all FIRREA capital requirements by June 15, 1990." AR 180. In so doing, the State advised Pioneer's Board that failure to meet the directive could result in formal enforcement action, such as removal of directors or officers, civil money penalties, and/or appointment of a conservator. AR 181. OTS Cincinnati office utilized this information when they within their S-memo indicated that this, "confirms our position that the appropriate course of action is for Pioneer to be placed in the RTC." AR 43–44.

It is from these directives that Pioneer began to formulate various plans in an effort to meet the capital requirements of the OTS and State of Ohio. OTS states that beginning in mid–1989, Mr. Tonti began discussing the possibilities of merging Pioneer with one or more other financial institutions owned or controlled by Tonti himself or other members of his family. AR 43. Pioneer's response to the OTS supervisory staff was that Pioneer was working on a merger/liquidation and that soon Pioneer would no longer exist. AR 46. However, OTS has arduously stressed that the success of these various "bail-out" plans required approval of the Federal Reserve Board, the FDIC and the State of Ohio Division of Banks. AR 43. The applications which were submitted were returned because the transactions which were described "cannot be legally completed" and was "materially incomplete and

---

accepted the report, nor booked the losses which the audit reflected. AR 18, 20. *See* OTS' Motion for Summary Judgment, page 15, f.n. 6.

**11.** OTS will contend that Pioneer recognizes the value of their REO "is carried per GAAP at the lower of cost or N.R.V. *See* OTS Reply Memorandum P. 19; Pioneer's Exhibit 6 par. 12.

inaccurate and cannot be processed." AR 77. OTS further points out that it was determined that Tonti "has submitted very minimal information regarding his plans and seems unable or unwilling to provide specific information regarding the technical and financial aspects of his proposed transaction." AR 43. Notwithstanding, OTS points to two transactions which Mr. Tonti completed in order to boost Pioneer's capital structure. Tonti signed an agreement transferring Pioneer's office building to First Bank of Marietta. AR 205, 248. First Bank of Marietta is a financial institution controlled by Mr. Tonti and his wife. AR 121–122. A second transaction involved Pioneer's sale of $2.3 million in loans to First Bank of Ohio. First Bank of Ohio is another institution controlled by Mrs. Tonti. AR 121, 205. These transactions were ordered reversed by OTS and the Ohio regulators. AR 205, 247. OTS contends that OTS Pioneer hoped to book a profit of about $301,000 from these unapproved transactions. This would have met FIRREA's capital requirements. AR 202, 204. However, at the same time, Pioneer had made only three of the adjusted journal entries recommended by their own independent auditors. AR 203, 244–46. According to OTS, the FDIC also recommended adjustments totalling $674,000 which confirmed the outside auditor's findings. AR 203. Similarly, OTS examiners requested that Pioneer book a $571,000 reserve on the Young REO parcel, which Pioneer agreed to do as of June 30, 1990. AR 198. With all the above in mind, OTS determined a number of scenarios to determine Pioneer's solvency as of the time of the appointment of the receiver.

Accordingly, OTS concluded in scenario one and two that if none of the recommended adjustments were made and the association was permitted to book a profit from the prohibited transactions, Pioneer would be solvent. AR 197. In scenario number three, the auditor's adjustments would reduce Pioneer's tangible capital to negative $20,281, which figure represents a negative tangible capital value before reversing the profit booked on the prohibited affiliated transactions. AR 197–98. With

the reversals made, scenario number four finds Pioneer's tangible capital to be a negative $350,109 as of June 27, 1990. AR 198. Scenario number five would reflect a negative $169,780 in tangible capital if Pioneer only changed the Young REO valuation. AR 198. And finally, scenario number six reflected a profit and positive capital if the affiliate transactions were booked, but Pioneer still would not meet its core capital requirement. AR 198. Therefore, OTS concluded:

> Under Scenarios 3, 4 and 5 Pioneer is insolvent. Under Scenario 6 Pioneer would have positive capital but fail the core capital requirement. As we have discussed, the sale of the office building and the sale of the loans involved Tonti-controlled banks which qualify as affiliated persons. Consequently, the transactions are prohibited by regulation and Pioneer has been directed to reverse the transactions. Profit recognition is, therefore, inappropriate. It is our opinion that Scenario 4 most accurately reflects the capital position of Pioneer. AR 198.

Finally, in response to Pioneer's opposition to the receivership and claims of solvency, OTS within their Reply Brief address individually some of the Pioneer's challenges. OTS argues that the affidavits relied upon by Pioneer raise no genuine issue of material fact, inasmuch as they are either insufficient pursuant to the Federal Rules or they create no genuine issue of material fact as to whether or not at the time of the appointment of the receiver, the Director had a rational basis for his decision.

Specifically, OTS objects to the affidavit prepared by Robert Dixon, who is one of Pioneer's independent auditors. *See* Pioneer's Exhibit 6. According to OTS, the affidavit is "rife with assumptions that are impermissible as a matter of law and allegations that are unsubstantiated and based upon inadmissible evidence." Reply Memo p. 15. The Affiant relied upon the assumption that Pioneer's capital can be traced to the unauthorized sales of the office building and loans to affiliated institutions. In

paragraphs 8, 9, and 11, the Affiant bases his findings upon various assumptions as to the validity of the transactions which OTS has denied as unauthorized and/or between affiliated persons. This, according to OTS, increased Pioneer's capital by $544,000. And, utilizing the Affiant's assumption that if you included the aforementioned adjustments, Pioneer's capital would be $270,000, OTS finds that Pioneer actually would have negative capital.[12]

OTS also takes issue with the Affiant's claim that there should not have been any reliance by the Regulators upon the May 1990 Auditor's Report. OTS indicates that there has never been a September 28, 1990 Auditor's Report filed, as well as the May Auditor's Report was signed, thus giving it the character of a final report. Nevertheless, even if the May Report was not final, the September Report would be an addendum to the May Report and would be three months past the OTS decision to appoint a receiver for Pioneer. Therefore, it could not be a basis upon which this Court would consider the issues presented herein. Likewise, Pioneer's contention that the May 1990 audit reflected a $105,000 mistake should not be viewed by this Court. Pioneer's basis is a misunderstanding of the FDIC examination notes. However, OTS will contend that those notes cannot in and of themselves provide a basis for the auditor's independent evaluation. Furthermore, beyond misplaced reliance of the independent auditors, OTS states that the affidavit fails to substantiate how the alleged $105,000 was inaccurate, nor offer evidence which would be admissible as to a more correct figure. OTS will similarly take issue with Pioneer's claimed, but unsupported $36,000 "miscellaneous audit adjustments" assertion. Without more, OTS refutes the reliance that this Court should place upon the Affiant's conclusions.

OTS disagrees with three other specific objections made by Pioneer. As to the $17,000 error in calculating capital as of June 15, 1990, rather than May 31, 1990, OTS cites to *Telegraph*, at 873 and *Biscayne*, at 1503. Both cases support the proposition that the issue to be addressed is an association's solvency on the day of the appointment of the receiver or conservator, and not necessarily that of the association's particular accounting preference or choice. Regarding Pioneer's claim of improper real estate appraisals, OTS states that Pioneer recognizes within their own pleadings the need to carry the REO per GAAP at the lower of cost or N.R.V. Likewise, Pioneer again has not submitted more accurate values, only a disagreement with those offered by OTS. And finally, OTS takes issue with Pioneer's Exhibits number one through three. These three Affidavits are identical and brought on behalf of Pioneer's three Directors: A. Patrick Tonti, Thomas Tonti and Randall Perry. OTS concludes that the three affidavits are conclusory, relying upon faulty information or assumptions as to the legality of unauthorized sales, unreliable and unauthenticated information, making wrongful assumptions as to future sales and again tying OTS's placing Pioneer into receivership at the hands of the RTC, who is distinct and separate in function and legal authority from that of the OTS. Therefore, OTS argues that this Court should discount the three affidavits for they do not create a genuine issue of material fact and Pioneer has failed to meet their burden to come forth with evidence that would overturn the Director's decision to appoint a receiver for Pioneer. Inasmuch as Pioneer has failed to establish for this Court an arbitrary, nonrational basis for the Director's decision, OTS would reaffirm their position regarding the appropriateness of summary judgment.

---

**12.** The Affiant bases his $270,000 figure upon a 5/31/90 capital valuation of $418,105.94 according to GAAP. From the $418,105.94, he made adjustments reflecting the FDIC exam negatively affecting capital and their independent audit adjustments. Therefrom, the Affiant assumed the sale of Pioneer's loans and office building were legal to arrive at the $270,000 figure. *See* Pioneer's Ex. 6. OTS takes this $270,000 "alleged" figure and subtracts the $544,000 in unauthorized transfers to arrive at their assumption of negative capital. (Emphasis in original) *See* Reply Memo p. 17.

C. This Court has reviewed all of the pleadings, exhibits, remarks and administrative record filed within this case. The review herein has followed those standards delineated at the opening of this Opinion and Order. The focus of the review has been whether or not on June 29, 1990, The Director of the Office of Thrift Supervision rationally concluded based upon all of the evidence before him whether or not Pioneer Savings and Loan was in need of the appointment of a receiver pursuant to law. This decision could not be arbitrary or capricious. In so viewing the evidence, the administrative record as well as all of Pioneer's pleadings were analyzed. That was in keeping with our opinion that *Collie* controls the review to be afforded under 12 U.S.C. § 1464(d)(2)(E). Upon consideration of the aforementioned, it is the finding of this Court that OTS was in accordance with the law and not arbitrary or capricious in their action of appointing the RTC as receiver for Pioneer.

Pioneer primarily objects to three areas of OTS findings. Pioneer challenges the various values placed upon many of their assets and contends that in many instances, OTS undervalued assets or valued assets at an inappropriate time within their accounting cycle. They have challenged the sales or private attempts which Mr. Tonti attempted in order to meet the capital calls and capital requirements placed upon them by the Federal laws and regulators. Finally, Pioneer continues to explain that their financial demise is the result of poor participation loans which the RTC refused to properly pay to them. The RTC, and not Pioneer, is responsible for their under capitalization, and therefore it would be improper for this Court to rule that it was rational for the Director of OTS to find that Pioneer is insolvent.

This Court is not convinced. First, Pioneer has not established evidence as to proper values to be placed upon the various assets. Pioneer's disagreement with the various values is not enough to establish that the decision of OTS was arbitrary or capricious. In fact, Pioneer does not firmly establish that any of the values that they placed upon the assets is proper. Second, Pioneer's disagreement as to the "sales" does not remedy the fact that many of these sales required prior regulatory approval and were ordered reversed. Likewise, the point in time of this inquiry is that of the date of the appointment of the receiver, not that of later transactions. Therefore, Pioneer's objection to the later sales, if at all completed by the RTC, does not effect whether on June 29, 1990, the Director was arbitrary and/or capricious in is directive for the appointment of a receiver. Third, Pioneer's claim that it is the RTC working through the OTS that has led to their demise, does not replace the fact that the participation loans were in the hands of an association which itself is under RTC control. Moreover, the Texas District Court reserved judgment as to any value that Bright Banc may have improperly withheld from First Bank. Pioneer offers no evidence as to the specific value owing by new Bright Banc under RTC control or that in anyway that case in fact touches and concerns Pioneer. Further, Pioneer has not brought forth any evidence to refute OTS contention that OTS and the RTC are separate entities and cannot be jointly and severally accountable for Pioneer's financial difficulties. Instead, Pioneer relies upon the Affidavit of Robert Dixon, their independent auditor, whose Affidavit is replete with assumptions which are not proven nor reliable and who himself concedes that many of the conclusions drawn are derived by assumptions that he cannot guarantee or confirm. Finally, as to the three Affidavits of the Pioneer Directors and Officers, it has readily been held without saying that mere conclusions, without a basis for the assumption, does not create a genuine issue of material fact. *See Wilson v. Kassicieh,* No. 89–3447, slip op. at 3 (6th Cir. April 1990) [899 F.2d 15 (table)], *citing, Morgan v. Churches Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987); and, *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990), *citing, Patterson v. General Motors Corp.,* 631 F.2d 476, 482 (7th Cir.1980) *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981). Simply put, those Affidavits do not

establish anything beyond their disagreement with OTS' decision and admit that they were attempting various "workout plans" for Pioneer's financial future. Solutions which require regulatory approval and which were attempted to increase capital without said approval cannot serve as a basis for this Court's reversal of the OTS directive.

WHEREFORE UPON BEING DULY ADVISED, this Court finds that Defendant, Office of Thrift Supervision's motion for summary judgment is hereby GRANTED. With all of the evidence exhaustively examined this Court cannot find that the Order from the Office of Thrift Supervision to place Pioneer Savings and Loan into receivership on June 29, 1990, was arbitrary, capricious and not otherwise in accord with law. Therefore, this case is DISMISSED.[13]

IT IS SO ORDERED.

---

**13.** Inasmuch as this Court has dismissed this case based upon the nonarbitrary or capricious actions of OTS which are fully in compliance with the law, OTS' other grounds of ineffective service of process and improper standing are deemed to be moot.